VINCENT T. LARSEN AND LOUISE LARSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32893-83.          Filed December 30, 1987.

---

*Thomas F. Topel, J. Marquis Eastwood, Kenneth L. Cutler,* and *Maureen H. Parkinson,* for the petitioners.
*Randall G. Durfee* and *Joel A. Lopata,* for the respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies in petitioners'[1] Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1979 | $33,087 |
| 1980 | 55,280 |

The primary issues for our determination are whether petitioner's transactions with respect to certain computer equipment were structured as a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal income tax purposes, and whether petitioner acquired the benefits and burdens of ownership. Subsidiary issues for our determination are (1) whether the ownership interest acquired, if any, was a present depreciable interest; (2) whether petitioner was entitled to deduct interest paid with respect to certain recourse and nonrecourse notes; (3) whether petitioner was at risk within the meaning of section 465[2] with respect to certain recourse notes and assumption agreements; (4) whether petitioner was entitled to elect the

---

[1]Petitioner Louise Larsen was not involved in any of the transactions at issue, and is a party to this action solely by reason of filing a joint Federal income tax return for each of the taxable years concerned. Unless otherwise specified, petitioner shall refer only to petitioner Vincent T. Larsen.

[2]Unless otherwise indicated, all sections referred to are sections of the Internal Revenue Code of 1954 as amended and in effect during the years in question, and all rules referred to are of the Tax Court Rules of Practice and Procedure.

half-year convention method of depreciation for the taxable year 1979, and whether petitioner was entitled to use the double-declining-balance method of depreciation for certain computer equipment; and (5) whether petitioner is liable for an additional interest amount determined pursuant to section 6621(c).[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners resided in the State of Montana at the time their petition herein was filed.

Petitioner received a bachelor of science degree in petroleum geology from Texas Tech University. Petitioner is a geologist, petroleum exploration consultant, and investor. Petitioner's investment experience relates primarily to investments in mineral interests and real estate. In addition to his own judgment, petitioner consults and relies on the judgment of his attorney, Gary Everson, for investment advice.

In four separate transactions that are the subject of this case, petitioner purchased[4] certain computer equipment manufactured by International Business Machines Corp. (IBM) and certain computer equipment manufactured by Honeywell Information Systems, Inc. (Honeywell).

### Finalco

Finalco is the principal subsidiary of Finalco Group, Inc., formerly Financial Analytics Corp., a publicly held corporation, the stock of which is traded over the counter and reported in NASDAQ quotations. The principal offices of Finalco and Finalco Group, Inc., are located in McLean,

---

[3]Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A) - (C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.

[4]The use of such terms as "purchase," "lease" and other like words does not imply that we consider the underlying transaction to be in fact construed as a "purchase" or "lease" for Federal income tax purposes. We probe beyond the labels given by the parties to determine whether an actual economic investment existed. *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89 (4th Cir. 1985).

Virginia. During the years in issue, Finalco was a closely held company.

During the years in issue, Finalco typically engaged in leasing transactions involving electronic data processing equipment in which Finalco negotiated and entered into a lease with an end-user, purchased the equipment, financed the purchase with a lending institution, and resold the equipment in a sale and leaseback transaction with an independent third party. The resale of the equipment provided Finalco with much of the capital necessary to generate additional lease transactions. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. During its fiscal year ending June 30, 1979, Finalco entered into lease transactions of approximately $129 million based on the original cost of equipment. John F. Olmstead (Olmstead) was president of Finalco at the time petitioner entered into the transactions.

### Lease Pro, Inc.

Lease Pro, Inc. (Lease Pro), is a Montana corporation engaged in the purchase, sale, and leasing of computer equipment. Lease Pro has served as a general partner in a partnership that leases personal property, other than computer equipment, and owns an interest in a leased building. During the years in issue, Lease Pro was owned by J.L. DuBois (DuBois) and Dean Schennum (Schennum). DuBois acted as the sales agent at Lease Pro. Schennum acted as business manager and administrator. DuBois and Schennum are also the principals in DuBois-Schennum Association, Ltd., a Montana corporation organized in August 1980, and registered with the National Association of Securities Dealers (NASD) for the purpose of acting as a broker-dealer. Lease Pro acted as sales agent for Finalco in the pursuit to locate investors. Lease Pro received a commission in the amount of 10 percent of the equity investment, including cash and any recourse note. During 1979 and 1980, Lease Pro's revenue attributable to Finalco-arranged computer-lease transactions approximated 90 percent of all revenue it earned. Lease Pro had no shareholders, officers, directors, or

employees in common with Finalco Group, Inc., its affiliates, or subsidiaries.

## Equipment Acquisition by Finalco

Petitioner purchased from Finalco certain peripheral computer equipment manufactured by IBM and Honeywell and subject to leases (end user-leases) with independent third parties (end-users). Although there were four separate transactions, there were only three end-users: Hon Industries, Inc. (Hon), Anaconda Industries (Anaconda), and Irving Trust Co. (Irving), with Irving being the end-user in two transactions. Each transaction shall be identified by reference to the end-user as follows: the Hon transaction, the Anaconda transaction, the Irving 1 transaction and the Irving 2 transaction, (the Irving 1 transaction, and Irving 2 transaction may sometimes collectively be referred to as the Irving transactions). The equipment purchased in each transaction shall be referred to as the Hon equipment, Anaconda equipment, Irving 1 equipment, and Irving 2 equipment, respectively. At times, the pieces of peripheral equipment involved in those transactions will be referred to collectively as "the equipment."

## I. The Hon Transaction

Finalco agreed to purchase the Hon equipment from Honeywell pursuant to a sales agreement and equipment schedule (the Honeywell sales agreement) executed by Finalco, and Honeywell. The Honeywell sales agreement was dated August 29, 1979, by Finalco, and January 18, 1980, by Honeywell. The Honeywell sales agreement required Honeywell to ship the Hon equipment in September 1979. According to Richard Meise (Meise), the executive who signed the Honeywell sales agreement on behalf of Honeywell, it was standard practice for Honeywell to ship goods after receiving a signed contract from a customer, but before Honeywell executed the agreement. Honeywell shipped the Hon equipment in September 1979, as required by the Honeywell sales agreement. Hon accepted the Hon equipment as installed and operational on September 15, 1979. Finalco was obligated to pay for the Honeywell

equipment when it was shipped to Hon. Finalco acquired the Hon equipment on September 15, 1979, the date of Hon's acceptance of such equipment and of the Honeywell bill of sale to Finalco.

Finalco leased the Hon equipment to Hon pursuant to a master lease agreement dated August 13, 1979, which was later amended on October 22, 1979, January 21, 1980, and March 15, 1980 (the Hon lease). The initial term of the Hon lease was 60 months commencing September 15, 1979. The monthly rental was $1,963.83. The first amendment dated October 22, 1979, deleted items of equipment from the Hon lease. The second amendment to the lease, dated January 21, 1980, reduced the rent from $2,022.78 to $1,963.83 per month because Iowa eliminated a use tax. Hon had an option to renew the Hon lease for 1 year and an option to upgrade the equipment. Hon did not have an option to purchase. NSCC Leasing Corp. (NSCC) loaned Finalco $83,415 which Finalco used to pay for the Hon equipment. Finalco executed a nonrecourse promissory note in the amount of $83,415, dated January 31, 1980 (the NSCC note). The NSCC note was secured by an installment note and security agreement executed by petitioner in favor of Finalco, petitioner's lease to Finalco, and the Hon lease. The NSCC note provided for interest at the rate of 11.375 percent per annum and required Finalco to pay the principal and interest by making 54 monthly payments to the NSCC of $1,953.83 each, commencing March 1, 1980.

## II. *The Anaconda Transaction*

Finalco purchased the Anaconda equipment from IBM pursuant to the supplement to agreement for purchase of features and model conversion. Finalco paid IBM $150,000 for the Anaconda equipment, which was the IBM list price. The Anaconda equipment was shipped by IBM to Anaconda on August 14, 1979.

Finalco leased the Anaconda equipment to Anaconda pursuant to a lease agreement (the Anaconda lease) dated August 14, 1979. The initial term of the Anaconda lease was 39 months at a monthly rental of $4,293.

The Anaconda lease gave Anaconda an option to upgrade, at terms related to costs associated with an upgrade, and a

cancellation option after 27 months. Anaconda did not have an option to purchase the Anaconda equipment. The Anaconda equipment was certified by Anaconda as installed and operational on August 27, 1979.

The Financial Corp. of Illinois (Illinois) loaned Finalco $133,879.43, which Finalco used to purchase the Anaconda equipment. Finalco executed a nonrecourse promissory note in favor of Illinois in the amount of $133,879.43, dated October 2, 1979 (the Illinois note). The Illinois note was secured by a promissory note and security agreement executed by petitioner in favor of Finalco, petitioner's lease to Finalco, and the Anaconda lease. The Illinois note required Finalco to make 36 monthly payments to Illinois for $4,283, commencing November 1, 1979, and continuing through November 1, 1982.

## III. *The Irving Transactions*

Comdisco Inc., (Comdisco), a publicly held Delaware corporation, is unrelated to Finalco and is a competing equipment leasing company that buys and sells new and used IBM computer equipment and arranges leases of such equipment. During the years in issue, Comdisco and Finalco Group, Inc., or its subsidiaries, had no common shareholders, officers, directors, or employees.

Comdisco owned certain IBM equipment that it leased to Irving pursuant to a master lease dated December 19, 1979 (the Irving lease). The initial term of the Irving lease was 36 months commencing on December 21, 1979. Irving had an option to upgrade certain items of equipment at terms to be negotiated at the time of the upgrade and an option to terminate the lease of any items of equipment after the first 24 months of the initial lease term. Irving did not have an option to purchase the equipment. A portion of the equipment covered by the Irving lease was the Irving 1 equipment and the Irving 2 equipment.

Citicorp Industrial Credit, Inc. (Citicorp), loaned Comdisco $4,075,348.79 which it used to purchase all of the computer equipment subject to the master lease with Irving, a portion of which was the Irving equipment. Comdisco executed a nonrecourse promissory note in favor of Citicorp, in the amount of $4,075,348.79, dated January 1, 1980, with a

maturity date of December 1, 1982 (the Citicorp note). The Citicorp note was secured in part by the Irving equipment.

Blackwood Corp. (Blackwood) is a wholly owned subsidiary of Finalco Group, Inc., and sister corporation to Finalco. In a purchase agreement dated December 1, 1979 (the Comdisco purchase agreement), Comdisco sold used computer peripheral equipment and leases, including the Irving equipment and the Irving lease, to Blackwood Corp., subject to existing liens and leases. The purchase price was $5,072,214.11, which was payable in cash, promissory note, and assumption of debt. Comdisco transferred equipment, including the Irving equipment, to Blackwood by a bill of sale dated December 1, 1979. Blackwood simultaneously entered into a management and remarketing agreement with Comdisco (Comdisco management and remarketing agreement). The Comdisco management and remarketing agreement provided that Comdisco would manage the equipment from December 1, 1979, until November 30, 1986, at which time either party could terminate the agreement upon 30-days written notice. The Comdisco management and remarketing agreement provided that Comdisco may exchange and substitute equipment of the same model and condition as the Irving equipment with the owner. The Comdisco management and remarketing agreement provided that proceeds from the sale or re-lease of the Irving equipment are apportioned as follows:

1. 10% of the net sales proceeds or net re-lease rentals (discounted over the re-lease term at the then lender's interest rate) shall be payable to the party remarketing such Equipment (either Owner or Agent) as a remarketing fee (the "Remarketing Fee"). If Agent and Owner simultaneously receive bonafide offers * * * the parties agree that the offer with the highest sale price or net re-lease rental shall be the offer that is accepted, otherwise, such remarketing shall be on a first-in basis.

2. After distribution of the Remarketing Fee, the next 13% of the Fair Market Value of such Equipment as set forth in Schedule E of the Purchase Agreement shall be payable to Owner * * * [5]

3. Thereafter, any excess Equipment Proceeds shall be apportioned as follows:

> 75% to the Owner
> 25% to the Agent

---

[5]Schedule E to the Comdisco purchase agreement which sets forth the specified fair market value of the Irving equipment is not within the record.

## *Purchase by Petitioner*

Petitioner is a petroleum geologist who developed an information system concerning oil and gas deposits. A company purchased data generated by the system from petitioner for use in the exploration of the Willison Basin area. The Willison Basin is a large oil province in the States of Montana, North Dakota, and South Dakota, and which extends into Canada. Pursuant to the contract and terms of such acquisition, petitioner is paid a royalty. During the years 1979, 1980, 1981, and 1982, petitioner earned substantial net royalty income attributable to the information system in the respective amounts of $104,937, $213,197, $478,097, and $535,475.

Petitioner preferred to invest in oil and gas investments because of his personal knowledge and demonstrated skill. Petitioner had acquired a few real estate investments. Petitioner desired an investment which he described as a "safe" investment. Petitioner was concerned with asset protection and asset growth potential. With respect to the equipment transactions, petitioner relied on the advice of Gary Everson (Everson), who was petitioner's attorney and personal friend. Petitioner had some initial discussion with DuBois of Lease Pro. Based on conversations with Everson and DuBois, petitioner was aware that the residual value of the equipment was critical to the earning of economic profit. Based on DuBois' representations, petitioner assumed residual value would be sufficient to earn economic profit. Petitioner did not undertake independent analysis.

Everson has specialized his practice in taxation and has earned a masters of law in taxation degree at Boston University. According to Everson, he discussed the equipment transactions with Lowell Duffner, an accountant in Billings, Montana, who had previously purchased equipment from Finalco. Everson reviewed a Newsweek article which generally described equipment leasing transactions and certain tax considerations. Everson evaluated sample documents provided by DuBois but was not aware of the actual equipment to be purchased. Everson did not seek an independent appraisal of the equipment to ascertain the fair market value or the residual value. Everson did not contact the end-user or inquire as to the fair market rental rate of

the equipment during the owner lease. Everson was not aware of the role or the interest of Comdisco evidenced in the Comdisco management and remarketing agreement. Petitioner signed the purchase agreements on December 20, 1979. In correspondence dated December 28, 1979, Everson detailed the tax aspects of the transactions and performed a financial analysis which assumed petitioner invested any tax-deferred dollars in an investment to earn an 8-percent return. Within the correspondence of December 28, 1979, and with respect to the residual value of the equipment, Everson merely stated that "Jerry [DuBois] seems very confident that it [the equipment] will be sold and you will get at least that amount [120 percent of net equity] on your investment." Everson relied solely upon the representations of DuBois and Finalco regarding the residual value of the equipment.

On December 20, 1979, petitioner executed four purchase agreements with Finalco (the purchase agreements). In a purchase agreement dated August 15, 1979, petitioner agreed to purchase the Hon equipment from Finalco for a total purchase price of $95,665 ( the Hon agreement). In a purchase agreement dated August 15, 1979, petitioner agreed to purchase the Anaconda equipment from Finalco for a total purchase price of $150,000 (the Anaconda agreement). In two purchase agreements, dated December 1, 1979, petitioner agreed to purchase from Finalco the Irving equipment 1 for a total purchase price of $105,645 (the Irving 1 agreement) and the Irving 2 equipment for a total purchase price of $175,865 (the Irving 2 agreement).

The terms of the purchases, as set forth in the purchase agreements, were as follows:

| | Hon | Anaconda | Irving 1 | Irving 2 | Total |
|---|---|---|---|---|---|
| Recourse promissory note | $14,000 | $23,000 | $15,850 | $26,400 | $79,250 |
| Nonrecourse installment note | 81,665 | 127,000 | 89,795 | 149,465 | 447,925 |
| Total purchase price | 95,665 | 150,000 | 105,645 | 175,865 | 527,175 |

Each purchase agreement required petitioner to execute assumption agreements (the assumptions) which required the assumption of certain Finalco obligations. In all the purchase agreements, Finalco represented and warranted that on the date of sale, Finalco would own and convey good and marketable title to the equipment.

On December 20, 1979, petitioner signed the following promissory notes and security agreements (the recourse notes) in favor of Finalco:

| Transaction | Date of note | Final payment | Principal |
|---|---|---|---|
| Hon | 8/15/79 | 12/1/80 | $14,000 |
| Anaconda | 8/15/79 | 12/1/83 | 23,000 |
| Irving 1 | 12/01/79 | 12/1/81 | 15,850 |
| Irving 2 | 12/01/79 | 12/1/82 | 26,400 |

Petitioner was personally liable for the payment of principal and interest on the recourse notes. The recourse notes also granted Finalco a security interest in the equipment.

On December 20, 1979, petitioner made the initial $2,000 payment required on each of the recourse notes, by check in the amount of $8,000 payable to Finalco. All recourse notes were paid in full.

On December 20, 1979, petitioner signed the following installment notes in favor of Finalco (the installment notes):

| Transaction | Date of note | Principal | Monthly payment | Initial payment |
|---|---|---|---|---|
| Hon | 8/15/79 | $81,665 | $1,287.20 | 10/1/79 |
| Anaconda | 8/15/79 | 127,000 | 1,976.85 | 9/1/79 |
| Irving 1 | 12/01/79 | 89,795 | 1,397.73 | 12/1/79 |
| Irving 2 | 12/01/79 | 149,465 | 2,326.53 | 12/1/79 |

Each installment note was nonrecourse and required 96 monthly installments. To secure the obligations represented by the installment notes, petitioner granted Finalco a security interest in the equipment and any lease of the equipment and the proceeds from any transfer or lease of the equipment.

On December 20, 1979, petitioner signed the assumptions (referred to individually as the Hon assumption, Anaconda assumption, Irving 1 assumption, and Irving 2 assumption) for each transaction, in the following amounts:

| Transaction | Assumed amount |
|---|---|
| Hon | $37,000 |
| Anaconda | 48,400 |
| Irving 1 | 44,377 |
| Irving 2 | 78,866 |
| Total | 208,643 |

Each assumption of indebtedness was on a "full recourse basis" as to petitioner in the assumed amount. Finalco

calculated the amount of each assumption to equal the difference between the projected amount of taxable losses during the term of the leaseback to Finalco and the amount of cash and recourse notes invested in the transactions by petitioner. The Hon and Anaconda assumptions were signed and accepted by the lenders, NSCC and Illinois, respectively. The Irving assumptions were not signed by Citicorp, the lender, or Comdisco, the original obligor. According to Olmstead, Finalco intended the assumptions to convert the nonrecourse installment notes to limited recourse notes since the amounts assumed by petitioner were not additions to the purchase price. Any amounts paid by petitioner pursuant to the assumptions reduced the nonrecourse amounts owing on the installment notes.

By bill of sale,[6] Finalco conveyed the equipment to petitioner free and clear of all liens and encumbrances except for, among other things, the end-user leases, Finalco's leases from petitioner, security interests granted to Finalco by petitioner and, in the case of the Irving equipment, the Comdisco management and remarketing agreement.

### Leaseback to Finalco

On December 20, 1979, petitioner signed lease agreements between Finalco and petitioner providing that Finalco would lease back the equipment from petitioner (the owner leases) at monthly rents as follows:

| Transaction | Monthly rent |
| --- | --- |
| Hon | $1,300.04 |
| Anaconda | 1,976.85 |
| Irving 1 | 1,397.73 |
| Irving 2 | 2,326.53 |

The original term of each owner lease was 96 months. The owner leases gave Finalco an option to terminate after 12 months by paying a termination value which was a percent-

---

[6]Finalco conveyed the equipment by bill of sale dated:

| Transaction | Date |
| --- | --- |
| Hon | 9/15/79 |
| Anaconda | 8/27/79 |
| Irving 1 | 12/01/79 |
| Irving 2 | 12/01/79 |

age of the original cost, depending upon the time of termination, and an option to exchange for equipment of equal fair market value. The termination option did not grant Finalco possessory or ownership interests in the equipment. On December 20, 1979, petitioner assigned his interests in the owner leases to Finalco as additional security for the installment notes. Finalco assigned its interest in the Hon and Anaconda owner leases to NSCC and Illinois, in assignments dated January 31, 1980, and October 2, 1979, respectively.

### Remarketing and Residual Sharing

On December 20, 1979, petitioner signed remarketing agreements (remarketing agreements) in each of the four transactions in which petitioner agreed to pay Finalco 10 percent of the proceeds received from the sale or re-leasing of the equipment for any remarketing services performed by Finalco. The 10-percent remarketing fees provided for in the remarketing agreements were unilaterally reduced, without negotiation by petitioner, to 3 percent in July 1981 by Finalco. Pursuant to residual sharing agreements (residual sharing agreements) signed by petitioner in December 1979 in each transaction, petitioner is entitled to 50 percent of the proceeds received by Finalco from leasing the equipment during a portion of the original term of the owner lease. The sharing commenced after the 60th month of the Hon lease, the 48th month of the Anaconda lease, and the 84th month of the Irving leases. Pursuant to the residual sharing agreements, all proceeds from the sale or re-lease of the equipment in any of the transactions will be distributed to petitioner until he has received 120 percent of his net equity. Net equity is defined as the amount of any cash and recourse note invested by petitioner less cash-flow distributions. The residual sharing agreements provide that of remaining proceeds, petitioner was obligated to pay Finalco a commission of 20 percent of the remaining proceeds if Finalco arranged the sale or re-lease of the equipment covered by the applicable residual sharing agreement.

## Finalco Practice of Dating Documents

Although petitioner signed the purchase agreement and other related documents including the leaseback documents on December 20, 1979, the Hon transaction and Anaconda transaction documents bore the date of August 15, 1979, and the Irving transaction documents bore the date December 1, 1979. The documents were prepared and packaged by Finalco. According to Olmstead, Finalco dated documents transferring title to the investors on or before the end-user lease, so that banks which financed the acquisition of the computer equipment would have a first-perfected security interest in the equipment. Also, according to Olmstead, Finalco did not date documents in a year prior to the tax year in which the investor purchased the equipment, or if the investor purchased the equipment in the last half of the tax year, Finalco did not date such documents in the first half of the tax year in order to comply with the modified half-convention method of depreciation. In the Hon and Anaconda purchase agreements, Finalco represented and warranted that petitioner "shall be entitled, for Federal Income Tax purposes to treat the total cost of the equipment as new equipment for purposes of the deduction for accelerated depreciation under Section 167 of the Internal Revenue Code of 1954." Finalco was aware that petitioner did not sign the Hon and Anaconda purchase agreement until December 20, 1979, and that such equipment was placed in service prior to such date. Furthermore, the Honeywell sales agreement indicates that the Hon equipment was installed equipment being converted to purchase and that the Hon equipment was not new when acquired by Finalco, even though the parties to that agreement agreed to treat the Hon equipment as new equipment, as defined in the Internal Revenue Code for depreciation purposes.

## Industry Conditions

The market for third-party leasing of computer equipment developed rapidly in the 1970's. Projections of residual values are critical to evaluate an investment in computer equipment. Such projections vary among experts and fluctu-

ate with market conditions. Computers do not depreciate with age, but rather are subject to technological obsolescence. Because IBM dominates the computer industry, the technological advancements of IBM products have significant impact upon the residual value of progenitors. Industry experts have had varied success in the ability to predict technology advancements of IBM. The volume of used computer equipment transactions can be discerned from the advertisement of the weekly trade journal, Computer World. IBM has the largest market share and IBM computer prices are indicated in the Computer Price Guide (The Blue Book).[7] In 1979, Computer World referenced few Honeywell used-computer advertisements.

Honeywell acquired the General Electric computer line in 1970. Honeywell encountered difficulty producing a unified product combining the desired features of each computer line. The Honeywell 6000 Series was announced in 1971, but utilized peripheral equipment developed by General Electric for the GE500 Series. The Honeywell Series 60 was introduced in 1974, and was developed to compete with the IBM 370 Series which was introduced in 1971. The Honeywell Series 60 presented new Honeywell peripheral equipment; nonetheless, the state-of-the-art specifications were comparable to the IBM 370 which had been on the market for 3 prior years. The Honeywell Series 60 was intended to serve as an upgrade product to the Honeywell 6000. The IBM 370/138 was introduced as an enhanced IBM 370 Series product in June 1976. Honeywell responded with the enhanced Honeywell Series 60 Level 66/DPS in September 1978. In January 1979, IBM announced the IBM 4300 which presented a dramatic increase in price/performance capacity far in excess of the industry expectations. The IBM 4300 depressed the expected residual values of existing computer equipment.

In 1975, Honeywell adopted an unprecedented policy intended to control the secondary sale of Honeywell equipment. Honeywell restricted the relicense of Honeywell computer software to secondary purchasers of Honeywell

---

[7]The Computer Price Guide is a quarterly journal published by Computer Merchants, Inc. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment, and is widely relied upon in the industry. See *Mukerji v. Commissioner,* 87 T.C. 926, 946-947 (1986).

central processors and charged substantial fees for engineering and standard maintenance as well as software relicensing. Honeywell desired to control the secondary sale of Honeywell equipment by limiting the use of support services and computer software. These costs imposed by Honeywell upon dealers or users of Honeywell equipment in the secondary market exceeded the standard established by IBM to acquire and maintain comparable IBM equipment.

In 1975, Honeywell agreed to exempt Finalco and subsequent owners of Honeywell computer equipment acquired from Finalco from the restriction on the transfer of licensed Honeywell software (the Honeywell-Finalco software agreement). Honeywell and Finalco had an extensive business relationship since the founding of Finalco in the year 1968. Some Finalco programs included Honeywell residual participation, and Honeywell provided financing for some Finalco acquisitions. The amendment to the Honeywell sales agreement provided that:

> All references to software products and computer programs in Exhibit A to the [Honeywell] Sale Agreement are hereby deleted, since Honeywell will directly license software products to Hon. Honeywell agrees, that upon request of Finalco at any time in the future, it will license any of its then current software products and provide any other items or materials required to make the Equipment operational to Finalco or its assignee or subsequent purchasers or lessees from Finalco, pursuant to Honeywell's then current terms, prices and conditions.

Finalco and certain Honeywell users developed a network to provide maintenance specialists to service Honeywell equipment acquired from Finalco. The maintenance function network was incorporated in 1978, and coordinated the maintenance functions among various Honeywell users and published a Honeywell user newsletter.

As previously stated, the computer industry has been dominated by the technological advancements and strategic product planning of IBM for nearly three decades. In 1964, IBM introduced the 360 Series. The 360 Series unified a diverse line of computers into a single compatible family. In 1971, IBM introduced the 370 Series. IBM introduced new technological advancements in a predictable manner, such that mainframe computer models progressed in modest steps from the 360 Series family to the initial 370 Series

family of products. Each succeeding IBM introduction provided an incremental improvement in capability and was accompanied by a small incremental adjustment in price. IBM strategic product planning provided a degree of stability within the computer industry. IBM delayed the introduction of newer products to assure attractive returns on the vast amount of IBM leased equipment, yet timed the introduction of new products to deter migration of IBM end-users to the new products of competitors. During the 1970's, IBM altered its strategy to encourage end-user purchase, rather than lease and rental plans. Consequently, IBM introduced new products more frequently to maintain overall levels of revenue due to the reduction of revenue from lease or rental plans.

In June 1976, IBM announced the 370/138 and the 370/148 computers which were designed to enhance the sales performance of the products within the mid-range 370 Series. The price performance capabilities of the 370/138 and 370/148 out-distanced the earlier 370 Series computers. The initial market reaction was highly favorable, such that during 1977, the fair market value in the used-equipment market of 370/138 and the 370/148 exceeded the IBM list price.

The computer industry was generally tranquil during the mid-1970's due to IBM product planning. In March 1977, the IBM 3030 Series was introduced. Despite introduction of the IBM 3030, the IBM price reductions on the 370/158 and 370/168, prices of used computers remained at relatively high and stable values. The Blue Book stated, in the July 1977 issue, that most of the equipment in general use at that time would have substantial value at the end of the 1980's. In October 1977, IBM announced two additional 3030 computers, the 370/3032 and the 370/3031. Datamation magazine, an industry publication, noted that the new processors were so similar to the 370/158 and the 370/168 that "the industry yawned as IBM this fall announced the much rumored 3031 and 3032 central processor." The 370/158 and 370/168 were of comparable price performance capabilities to the 370/303 family.

During the late 1970's, IBM was faced with increased competition from manufacturers of plug-compatible equip-

ment, imitation IBM equipment designed to displace IBM equipment at a lower cost, particularly plug-compatible central processors. IBM also faced increased competition from manufacturers of minicomputers. In January 1979, IBM introduced the 4300 Series. The industry had not expected the drastic increase in the price performance capabilities presented by the 4300 Series. The IBM marketing strategy undertaken to react to the plug-compatible processors and the minicomputer market significantly reduced the previous prognostications of mainframe residual values.

While the mainframe market was devastated following the introduction of the 4300 Series in January 1979, the market for IBM peripheral equipment remained somewhat stable. The primary factor for such occurrence was that most peripheral equipment for the 360 and 370 Series was compatible with the 303X Series and, significantly, the 4300 Series. Consequently, the residual value of IBM peripheral equipment for any such series was generally insulated from the adverse market effect of subsequently introduced central processors due to the compatibility of most peripheral equipment. Furthermore, the basic electromechanical nature of peripheral equipment precluded the rapid technological advancements inherent to mainframe products.

### Expert Testimony of Value of the Equipment

S. Paul Blumenthal (Blumenthal) was qualified to testify as an expert on behalf of petitioner concerning the Honeywell equipment in the Hon transaction. Blumenthal is a senior vice president of American Computer Group and is a senior corporate officer of American Technology Appraisal Service (ATAS), a valuation consulting division of American Computer Group.[8]

Esmond C. Lyons, Jr. (Lyons), was qualified to testify as an expert on behalf of petitioner concerning the IBM equipment in the Anaconda transaction and the Irving transactions. Lyons is the principal management consultant in the Information, Services and Systems Division of SRI

---

[8]American Computer includes two additional operating divisions. American Terminal Lease Corps. lease computer terminals, and American Used Computers tracks used computers in the secondary market.

International (SRI), formerly known as the Stanford Research Institute. SRI is a not-for-profit corporation which is involved in technology research and management consulting for business and Government clients.

Dee Morgan (Morgan) was qualified to testify as an expert on behalf of respondent in each transaction at issue. Morgan has worked for IBM as a systems service representative and for Burroughs Corp. as a technical service representative. From 1965 through 1983, Morgan was employed by the General Services Administration (GSA) as a computer equipment analyst and data processing systems coordinator. While employed with GSA, Morgan provided estimates of residual value and economic life analysis of computer equipment to the Defense Contract Audit Agency.

The Hon equipment was comprised of certain peripheral equipment for the Honeywell Series 60 System including two disk drives, a communications controller, and two display terminals.

Blumenthal stated that the August 1979 Honeywell list price for the Hon equipment was $98,465, and that the fair market value of such equipment at that time was $75,556, or approximately 77 percent of the Honeywell list price. Blumenthal set forth two methods of valuation and adopted the mathematical average of such methods as his opinion of fair market value. Blumenthal concluded that the Hon purchase agreement price of $95,556 was reasonable due to the Honeywell-Finalco software agreement and maintenance services available to owners or users of Honeywell equipment acquired in Finalco-arranged leases. Blumenthal reviewed the records of ATAS and concluded that 24 percent of the Honeywell list price was the amount of value added to Finalco-arranged leases of Honeywell.

Morgan concluded that the Honeywell list price of the Hon equipment in August 1979 was $95,665, and that the fair market value of such equipment at that time was $48,000, or approximately 50 percent of the Honeywell list price.

Blumenthal set forth two methods available in August 1979 to estimate the residual value of the Hon equipment at the termination of the owner lease on September 15, 1987. Blumenthal relied on the report prepared by SRI in the year

1975 (the SRI report). The SRI report included a graph entitled "Used Computer and Peripheral Valuation Curves," which Blumenthal includes in his report.[9] Based on the SRI report, Blumenthal estimated the residual value of the Hon equipment to be $15,754, or approximately 18 percent of the Honeywell list price. Blumenthal did not factor the 24-percent addition of value due to the Honeywell Finalco software agreement and maintenance service agreement. A second method was based on a comparison between IBM peripheral equipment. Such comparison produced an estimate of residual value on September 15, 1987, to be $41,252, or approximately 42 percent of the Honeywell list price. The IBM comparison method factored the addition of value of 24 percent due to the Honeywell-Finalco software agreement and maintenance service network.

Blumenthal opined that petitioner could expect the amount of contingent or interim revenue to be received pursuant to the residual sharing agreement to commence in September 1984, which was $18,708 based on the residual value ascertained from the SRI report, or $52,185 based on the residual value ascertained from the IBM comparison method.

Morgan opined that the residual value of the Hon equipment would be zero as of August 1984, such that no interim revenue should be expected during the residual revenue sharing term of the owner lease. According to Morgan, the residual value of the Hon equipment at the termination of the owner lease in September 1987 was necessarily zero.

The Anaconda equipment included peripheral equipment, specifically a 2 megabyte memory upgrade for the IBM 3031-2 central processor.

The IBM list price for the Anaconda equipment in September 1979 was $150,000, the price which petitioner paid. Lyons concluded that petitioner's purchase of the Anaconda equipment for the IBM list price was the fair market value of such equipment in September 1979. Lyons opined that in September 1979, it would have been reasonable to expect the residual value of the Anaconda equip-

---

[9]The Stanford Research Institute graph is reproduced in our opinion of *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184, 193 (1983), affd. on this ground 752 F.2d 89 (4th Cir. 1985).

ment in September 1987, at the termination of the owner lease, to be between $15,000 and $30,000, or approximately 10 to 20 percent of the IBM list price. Lyons provided no interim revenue opinion concerning any rental income petitioner might reasonably expect to share commencing after the 48th month of the owner lease.[10]

Morgan opined that the fair market value of the Anaconda equipment in September 1979 was $127,500, or 85 percent of the IBM list price. Morgan concluded that the residual value at the commencement of the interim revenue term in August 1983 would be $15,000, or 10 percent of the IBM list price. Morgan concluded that the residual value at the termination of the owner lease in August 1987 would be zero.

The Irving 1 equipment included four IBM 3803-2 tape control units with two switch options. The IBM list price in December 1979 was $206,820. Petitioner paid $105,645, or 51 percent of the IBM list price. The parties agree that the fair market value of the Irving 1 equipment was $105,645 in December 1979. Lyons concluded that in December 1979 it would have been reasonable to expect the residual value of such equipment to be between $40,000 and $60,000, or approximately 20 to 30 percent of the IBM list price. In December 1979, Morgan would have projected the residual value of the Irving 1 equipment to be zero at the commencement of the interim revenue sharing provisions on December 1, 1986. Morgan necessarily concluded that the residual value, at the termination of the owner lease in December 1987, would be zero.

The Irving 2 equipment included five IBM 3350-C2 disk drives with an 8150 strong switch. In December 1979, the IBM list price for the Irving 2 equipment was $229,950. Petitioner paid $175,865, or approximately 76 percent of the IBM list price. The parties agree that the fair market value of the Irving 2 equipment was $175,865 in December 1979. Lyons concluded that in December 1979, it would have been reasonable to expect that the residual value of such

---

[10]At the expiration of the Anaconda lease on Nov. 30, 1982, Anaconda returned the Anaconda equipment to Finalco. Finalco re-leased the Anaconda equipment to Oregon Health Services University for 36 months, commencing Feb. 1, 1983, to terminate Jan. 31, 1986, at a monthly rent of $480 less a 3-percent remarketing fee to Finalco. Petitioner should receive $8,380.80 from such re-lease.

equipment, at the termination of the owner lease in December 1987, to be between $35,000 and $55,000, or approximately 15 to 25 percent of the IBM list price. Morgan concluded that the Irving 2 equipment could expect a residual value of $17,500 on December 1, 1986, at the commencement of the interim revenue provisions. Morgan concluded that the residual value of the Irving 2 equipment on December 1, 1987, at the termination of the owner lease, would be $8,750.

### Tax Reporting

Petitioner reported the following items with respect to the purchase and leaseback of the equipment on his joint 1979 Federal income tax returned:

| | | 1979 | | | |
| | Hon | Anaconda | Irving 1 | Irving 2 | Total |
|---|---|---|---|---|---|
| Rental income | $3,900 | $7,907 | $1,398 | $2,327 | $15,532 |
| Interest expense | 1,519 | 3,415 | 0 | 0 | 4,934 |
| Depreciation | 13,666 | 21,429 | 15,846 | 26,380 | 77,321 |
| Taxable income (loss) | (11,285) | (16,937) | (14,448) | (24,053) | (66,723) |

Finalco sent petitioner a completed Class Life Asset Depreciation Range System (CLADR) Form 4832 for 1979, a copy of which was attached to petitioner's 1979 Federal income tax return. Based on the representations of Finalco, petitioner treated the Hon equipment and the Anaconda equipment as new equipment with a 7-year useful life, and adopted the double-declining-balance method of depreciation. Petitioner treated the Irving equipment as used equipment, and adopted the 150-percent declining-balance method of depreciation with a 5-year useful life. Petitioner elected the half-year convention to depreciate all computer equipment. For each of the taxable years 1980 through 1983, inclusive, petitioner reported an aggregate net loss from the purchase and leaseback of the equipment as follows:

| Taxable year | Net loss |
|---|---|
| 1980 | $103,750 |
| 1981 | 60,773 |
| 1982 | 41,614 |
| 1983 | 26,670 |

For taxable year 1984, petitioner reported taxable income of $19,135 from the purchase and leaseback transactions regarding the equipment. For the taxable year 1985, Finalco projected at the time of trial that petitioner will recognize taxable income of $52,340.

OPINION

The present case is a companion case selected as one of five representative test cases for a large number of dockets involving the investment in Finalco-arranged sale and leaseback transactions of leveraged computer equipment.[11] Respondent's primary assertion, determined within the statutory notice of deficiency, was that petitioner should not be treated as the owner and the lessor of the equipment as of December 31, 1979, for Federal income tax purposes, because petitioner's transactions with respect to the equipment were tax-avoidance schemes devoid of economic substance. Respondent's answer and amended answer raise affirmative allegations not within the notice of deficiency. Respondent's answer alleges that petitioner was not at risk within the meaning of section 465 with respect to the four installment notes executed as part of the purchase price for the equipment. Respondent's amended answer also raised the following affirmative allegations not within the statutory notice of deficiency: (1) Promissory notes and assumptions do not qualify as amounts at risk within the meaning of section 465; (2) petitioner is not entitled to elect the half-year convention method of depreciation in 1979; and (3) petitioner is liable for additional interest pursuant to section 6621(c). Respondent bears the burden of proof as to the affirmative allegations raised in the answer and amended answer. Rule 142(a).

Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir.

---

[11]The companion cases are:

*Sturm v. Commissioner*, T.C. Memo. 1987-625; *Moore v. Commissioner*, T.C. Memo. 1987-626; *Shriver v. Commissioner*, T.C. Memo. 1987-627; and *Casebeer v. Commissioner*, T.C. Memo. 1987-628.

1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 196; *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. *Frank Lyon Co. v. United States, supra; Estate of Thomas v. Commissioner*, 84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the non-user-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction, and that the transaction was supported by economic substance. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 201-203.[12] In *Rice's Toyota World, Inc.*, we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 196.[13]

Our inquiry of business purpose and economic substance is inherently factual, as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. *Torres v. Commissioner*, 88 T.C. 702 (1987); *Bussing v. Commissioner*, 88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987); *Gefen v. Commissioner*, 87 T.C. 1471 (1986); *Mukerji v. Commissioner*, 87 T.C. 926, 968 (1986); *James v. Commissioner*, 87 T.C. 905 (1986); *Coleman v. Commissioner*, 87 T.C. 178 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); *Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.*[14]

---

[12]*Carlson v. Commissioner*, T.C. Memo. 1987-306.

[13]The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. *Cherin v. Commissioner*, 89 T.C. 986 (1987).

[14]*Dobbs v. Commissioner*, T.C. Memo. 1987-361; *Kaufman v. Commissioner*, T.C. Memo. 1987-350.

We noted in *Rice's Toyota World* that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. at 197. In this context, petitioner bears the burden of proof, as respondent's determination that the transaction was a tax-avoidance scheme devoid of economic substance is presumptively correct. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). Based on our review of the record herein, we conclude that the four transactions were not motivated by a business purpose, and that the Hon and Anaconda transactions were devoid of economic substance and are to be disregarded for Federal income tax purposes. We further find that the record provides sufficient evidence that the Irving transactions were transactions imbued with economic substance. Consequently, the Irving transactions are accorded recognition for Federal income tax purposes.

We are satisfied that petitioner did not manifest the requisite business purpose necessary to justify the form of the transaction. Petitioner impressed us as an intelligent and articulate witness with a certain degree of business acumen. While we are persuaded that petitioner required legal and tax advice with respect to the equipment transactions, we are also convinced that the advice sought was motivated solely by the tax considerations, as petitioner did not investigate critical aspects of the business decision to enter the transaction. Petitioner did not investigate the fair market value or the residual value of the equipment, or appreciate the terms and effect of the Finalco interest in the remarketing agreement and residual sharing agreement. Significantly, petitioner stated that his desired investment strategy was risk-averse, and that a "safe" investment was desired to protect petitioner's personal worth acquired. We believe that a prudent investor would acknowledge that in December 1979, leveraged computer lease transactions were inherently risky due to obsolesence in computer technology. We found petitioner's testimony to be self-serving in this respect. Petitioner relied on Everson. Everson made limited inquiries concerning the equipment transaction, other than the anticipated tax considerations. However, in correspondence to petitioner detailing the tax effect of the equipment

transaction, Everson indicated the necessity of residual value and his view that DuBois seemed confident that residual value would exist. We are convinced that petitioner entered the transaction for the attendant tax benefits, and that the form of the transactions were not justified by any business purpose.

The focus of our inquiry is to perform an objective analysis of the transactions to determine whether any realistic opportunity for economic profit existed exclusive of the anticipated tax benefits. We analyze the transaction as a prudent investor (*Rice's Toyota World, Inc. v. Commissioner*), 84 T.C. at 209, but we recognize that our determination cannot depend on unrealistic demands for certainty. *Gefen v. Commissioner*, 87 T.C. at 1492.

The parties rely on expert testimony to establish the fair market value of the equipment as of December 1979, and the residual value of the equipment at the termination of the owner lease in December 1987. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985), and we may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of the transactions and the weight accorded to the expert testimony presented, we determine that the Hon transaction and the Anaconda transaction were not supported with economic substance; however, the record establishes that the Irving transactions pass muster under the economic substance standard.

### The Hon Transaction

Honeywell agreed in the Honeywell sales agreement with Finalco that the Hon equipment was new equipment, as defined in the Internal Revenue Code, for depreciation purposes. Such agreement also indicates that the Hon equipment was installed equipment leased by Honeywell directly to the end-user and converted to purchased equipment in August 1979, when Finalco acquired the Hon equipment. While there are some questions as to whether

the Hon equipment was new equipment as to petitioner, we are convinced that petitioner paid an amount in excess of fair market value.

Honeywell introduced the Series 60 Level 66/20 in 1974. According to Morgan, the technology of the Honeywell Series 60 was comparable to the IBM 370 Series introduced in the year 1971. The peripheral components of the Hon equipment were introduced in the year 1977; however, the record indicates that the Hon equipment was not, in technological terms, more advanced than the Honeywell peripheral equipment introduced in 1974. Morgan demonstrated that the Honeywell Mass Storage Unit MSU-452 included in the Hon equipment was similar to the Honeywell Mass Store Unit MSU-451 introduced in 1974, except for the cable which provided the electrical current. Blumenthal provided no evidence that the Hon equipment was technologically superior to the Honeywell equipment introduced in 1974. We have previously determined in a companion case that the Honeywell Series 60 Level 66/20 was comparable in technological terms to the IBM 370 Series introduced in 1971.[15]

The Hon equipment included peripheral components for use with the Honeywell Series 60 Level 66/20 central processor at the end-user. We discern from this record no material technological difference between the Hon equipment and the Honeywell peripheral equipment introduced in 1974. Blumenthal was inconsistent as to the base-year or introduction date of the Hon equipment. Blumenthal stated that the Honeywell System 60 was introduced in 1977, and that such equipment would exist in the market until August 1989, based on the SRI report. The SRI report utilized a 15-year economic life which would indicate an introduction date of 1974, given August 1989 as the termination date of economic life. At trial, Blumenthal indicated that he based his determination on a 12-year economic life to commence in 1977 and terminate in 1989. Despite such statement, Blumenthal, within his report, clearly utilized a 15-year economic life, and made reference to an introduction date of 1974. Furthermore, Blumenthal calculated the residual value of the Hon equipment, pursuant to the SRI report, based on

---

[15]*Sturm v. Commissioner*, T.C. Memo. 1987-625.

an introduction date of 1979. We are persuaded that the Hon equipment introduced in 1977 was, in a technological sense, similiar to the peripheral items introduced with the Honeywell Series 60 Level 66/20 in the year 1974, and that such equipment embodied technology comparable to the IBM 370 Series introduced 1971. Such determination is of significance to the determination of the fair market value as well as the residual value of the Hon equipment.

We are convinced that petitioner paid in excess of fair market value for the Hon equipment. The Honeywell list price according to the Honeywell sales agreement was $95,665. Petitioner paid Finalco the Honeywell list price, even though the Hon equipment was installed as equipment on lease from Honeywell and converted to purchase. Blumenthal concluded that the purchase price of the Hon equipment of $95,665 was reasonable, even though his opinion of fair market value was $77,556, because the Hon equipment was subject to a lease commitment to an end-user.[16] We are simply not persuaded that a prudent investor would pay the Honeywell list price for the Hon equipment under the circumstances extant, taking into consideration the end-user lease arrangement.

Blumenthal determined fair market to be the mathematical average of two methods. In our view, each method was not persuasive. The first method was based on the comparable value for IBM equipment to the Hon equipment. Blumenthal reviewed the records of ATAS to determine the value for the comparable IBM equipment to be $69,387. The record does not indicate the evidence of value of the IBM equipment, which Blumenthal determined to be comparable to the Hon equipment. Furthermore, Blumenthal determined that the Honeywell-Finalco software agreement, and the existence of the maintenance services network, added 24 percent to the value of the Hon equipment. The record does not support such contention. Blumenthal failed to demonstrate that a uniform increase of 24 percent due to software and service was warranted where the inherent technology was obsolete or approaching obsolesence. Pursuant to such view, the Hon equipment or any Finalco-arranged

---

[16]Blumenthal stated the Honeywell list price to be $98,465; however, the Honeywell sales agreement indicates that the Honeywell list price was $95,665.

Honeywell lease would not devalue to less than 24 percent. Blumenthal realized the fallacy of his determinations at trial. In contradiction to his report, Blumenthal stated on direct examination that the value of the Honeywell-Finalco software agreement and maintenance service network would decline to 10 percent over time. We find the attempt of Blumenthal to reduce the added value of the Honeywell-Finalco software agreement to 10 percent from 24 percent not to be persuasive. Blumenthal determined the fair market value of the Hon equipment pursuant to the IBM comparison method without the 24 percent addition of value to be $45,294, or approximately 46 percent of the Honeywell list price as determined by Blumenthal.

Blumenthal's second method to determine the fair market value of the Hon equipment was an ATAS dealer "ask" quote in 1979 for similiar Honeywell equipment in the amount of $81,726. Reliance on one dealer "ask" quote is questionable particularly where used computer equipment, in general, and Honeywell used computer equipment, in particular, are subject to a significant degree of negotiation. Furthermore, the record does not indicate whether the dealer "ask" quote included Honeywell software. We are not persuaded that the dealer "ask" quote was indicative of fair market value.

Morgan concluded that, even though the peripheral components of the Hon equipment retain value longer than a central processor, the fair market of the Hon equipment in December 1979 was the amount of $47,832, or 50 percent of the Honeywell list price. Such assertion is in excess of the amount determined by Blumenthal, without the addition of value for the Honeywell-Finalco software agreement and maintenance service network pursuant to the IBM comparison method. Although we do attribute some value to the fact that petitioner purchased an arranged leveraged lease subject to an end-user commitment (see *Mukerji v. Commissioner,* 87 T.C. at 965), we are convinced that petitioner paid an amount far in excess of fair market value. Based on our further determinations herein, we need not address the actual fair market value of the Hon equipment.[17]

---

[17]We have determined that petitioner paid in excess of fair market value for the Hon equipment. Consequently, the amount of the nonrecourse debt outstanding was greater than

We are not persuaded that it was reasonable in December 1979 to expect that the Hon equipment would retain significant residual value at the termination of the owner lease in December 1987. Blumenthal set forth two methods of residual valuation. The first method was based on the SRI report prepared in the year 1975. We have found that the Hon equipment was similiar in technological terms to the peripheral components introduced with the Honeywell Series 60 Level 66/20 in the year 1974, and that such technology was comparable to the IBM 370 Series introduced in the year 1971. We have set forth the inconsistencies of Blumenthal's report concerning the base year from which to determine the economic life of the Hon equipment. Based on the SRI report and an introduction date of 1971, the economic life of the Hon equipment would have terminated in 1986, and the owner lease would have remained in effect 1 year beyond the economic life of such equipment. Even based on the introduction date of 1974, the SRI report indicates that the residual value of the Hon equipment in the year 1987 would be 6 percent, an amount insufficient to pass muster of economic substance. Blumenthal concluded, pursuant to the SRI report, that the Hon equipment would retain 16-percent residual value in the year 1987; however, his report indicates that the introduction year given for such equipment was 1979. As we have set forth, the facts clearly indicate that the Hon equipment was introduced in 1977, and was, in technological terms, similiar to the Honeywell peripheral introduced in 1974, which was comparable to the IBM 370 Series peripherals introduced in 1971.

Blumenthal's second residual-value method was an IBM comparison method. Blumenthal concluded that the residual value of the Hon equipment in August 1987 would be $41,262. Blumenthal factored the 24-percent addition of value due to the Honeywell-Finalco software agreement and maintenance network, which we have determined to be

the value of the Hon equipment. The "prudent abandoment" test as set forth in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982), establishes that no portion of the nonrecourse debt is includable in basis, as such debt is not valid indebtedness for Federal income tax purposes. See also *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 209 (1983), affd. in part, revd. in part 752 F.2d 89 (4th Cir. 1985).

unsupported by the record. Furthermore, the record does not indicate that Blumenthal in fact compared the Hon equipment to comparable IBM equipment. Consequently, we do not attribute weight to such determination.[18]

Morgan determined that the Hon equipment would be of zero residual value in 1984 at the commencement of the interim revenue provisions of the residual sharing agreement, and that such equipment would similarly be of zero residual value in 1987 at the termination of owner lease. We found Morgan to be more credible than Blumenthal. Consequently, we determine that the Hon equipment would generate insignificant interim revenue commencing in 1984, and that the residual value in 1987, at the termination of the owner lease, would be zero, based on the introduction date of the Honeywell Series 60 Level 60/20 in 1974, with technology similiar to the IBM 370 introduced in 1971.[19]

### Anaconda Transaction and the Irving Transactions

Petitioner purchased IBM equipment in the Anaconda transactions and the Irving transactions. Lyons and Morgan provided expert testimony on behalf of the parties. The experts agree that petitioner paid fair market value for the Irving equipment in December 1979. Petitioner paid the IBM list price for the Anaconda equipment. Lyons concluded that the IBM list price was a beneficial price, because no Blue Book quotation was available due to the relative newness of the equipment. Morgan concluded that the fair market value of the Anaconda equipment was 85 percent of the IBM list price. While we do not discern that the IBM list price was necessarily a "beneficial" price to pay for the Anaconda equipment, nonetheless, we agree that such amount was fair market value. We attribute some degree of reasonable value to the fact that petitioner acquired an arranged computer lease transaction subject to an end-user commitment. *Mukerji v. Commissioner,* 87 T.C. at 965.

Lyons provided a range of residual value for each

---

[18]Blumenthal provided a contingent rent analysis based on the residual values determined pursuant to the SRI report method and the IBM comparison method. Because we do not accept such conclusions, we likewise attribute no weight to the contingent rent determinations.

[19]See also the companion case of *Sturm v. Commissioner,* T.C. Memo. 1987-625.

transaction.[20] We found the general methodology of Lyons to be credible. We are satisfied that Lyons relied solely upon methods and data available in December 1979 to determine the residual values. Lyons analyzed the historical performance of preexisting equipment designed to perform functions similiar to that of the equipment to determine economic life. Lyons reviewed the previous price performance of the equipment and analyzed current developments to determine whether the technological obsolescence of the equipment was expected. Lyons noted that the prognostication of residual values was subject to divergent views within the industry. To illustrate such point, Lyons appended to his report an article from the December 1, 1980, issue of Fortune Magazine entitled "Fortune-Tellers in the Computer Bazaar." Such article compared the predictions of several residual valuation firms made in 1979 and 1980, for the 1981 residual value of the IBM 3033. The owner leases at issue were for 96 months rather than a 1- to 2-year period which presented the fortune-teller of the equipment with a formidable task. Consequently, the prognostication in December 1979 of the 96th-month residual values at issue was certainly a task thick with mist. As one computer broker, quoted in the Fortune Magazine article, stated, "all the estimators do is throw darts at a board." In this context, we do not fault the opinion testimony of Lyons which cast the residual values in the form of ranges. For such reasons, and as further discussed herein, we accept the low-range residual value of Lyons in the Anaconda transaction and we accept the mid-range residual value of Lyons in the Irving transactions.

The testimony of Lyons is flawed with respect to an aspect of paramount significance in these transactions. The record indicates that a critical aspect of the transactions at issue was the effect of the residual sharing agreements in the performance of our objective analysis. The residual revenue-sharing agreements provided that petitioner was

---

[20]

| Transaction | Range of value | Percent of IBM list |
|---|---|---|
| Anaconda | $15,000 - $30,000 | 10 - 20 |
| Irving 1 | 40,000 - 60,000 | 20 - 30 |
| Irving 2 | 35,000 - 55,000 | 15 - 25 |

entitled to share 50 percent of all interim revenue with Finalco, commencing after the 48th month in the Anaconda transaction, and commencing after the 84th month in the Irving transactions. An opinion as to the amount of contingent interim revenue to be received is a fundamental variable in our objective analysis, particularly where interim revenue is to commence in the Anaconda transaction after the 48th month of the 96-month-term owner lease. In contrast, the Irving transactions provide interim revenue for the limited period of 12 months, to commence after the 84th month of the 96-month-term owner lease. Furthermore, the residual sharing agreements provided that petitioner was entitled to all residual revenue until petitioner received cumulative cash distributions equal to 120 percent of net equity. Any interim revenue received by petitioner reduced the net equity amount. Lyons provided residual values solely for the equipment as of the termination of the owner leases. Lyons provided no contingent rent regarding interim revenue to assist in our determination of economic substance. The record provides no indication as to the criteria used by Finalco to determine the interim revenue-sharing commencement date.

Based on our examination of this record, we conclude that Finalco primarily packaged a program of tax benefits for sale to petitioner and retained economic benefits during the original term of the owner leases, and retained a further interest in the remarketing agreements and the residual revenue-sharing agreements. In *Mukerji,* the taxpayer, Mukerji, entered into a transaction which provided "additional rent," similiar to the interim revenue provisions herein, to be paid by Comdisco to the taxpayer during the last 24 months of an owner lease. *Mukerji v. Commissioner,* 87 T.C. at 929. In that case, Comdisco retained no remarketing interest and residual interest in the transaction similiar to those which Finalco retained here, that further reduced any economic profit to the taxpayer. In the instant case, Finalco has exercised much imagination to retain the economic benefits of the transactions while giving the appearance of economic substance. We have stated previously that the drawing of a precise demarcation between those transactions that are supported with economic sub-

stance and those that are not so supported is invariably difficult. Based on this record, the omission of Lyons to provide testimony of reasonably expected interim revenue in each transaction, coupled with the retained interests of Finalco in the remarketing agreement, as well as the residual revenue provisions and interim revenue provisions of the residual revenue-sharing agreement has, to a significant extent, thwarted our analysis of economic substance. We restate that in this critical respect, the burden of proof is on petitioner, as respondent's determination that the transactions were tax-avoidance schemes devoid of economic substance is presumptively correct. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

In the Anaconda transaction, Morgan determined that, as of 1979, the residual value at the commencement of the interim revenue provisions in August of 1983 would realistically retain 10 percent of the purchase price or $15,000. Petitioner was entitled to receive 50 percent of rental income received by Finalco during the period August 31, 1983, to August 31, 1987. Morgan concluded that expected residual value at the termination of the owner lease on August 31, 1987, would be zero. The Anaconda equipment was a 2-megabyte expanded memory upgrade for the IBM 3031-2 Central Processor. IBM announced the IBM 3031 Central Processor in October of 1977, and first installed such equipment in the market during March of 1978. Morgan viewed the IBM 3031 as part of the IBM 370 Series introduced in 1971. Consequently, Morgan commenced the technological life of the Anaconda equipment as of 1971. While Lyons stated that the IBM 3031 Computer was at times referred to as part of the IBM 370 Series, Lyons did not agree that all IBM products designated as part of the 370 Series started technological life at the same time in 1971. We agree with Lyons to the extent that we find that the memory upgrade for the IBM 3031 should not relate back to the IBM 370 Series introduction date of 1971. We are persuaded that the Anaconda equipment, as of August 1979, could reasonably be expected to retain, at most, a residual value in August 1987 of $15,000 or 10 percent of the IBM list price. We do not accept a higher value within the range determined by Lyons. In our view, Lyons

discounted the significance of market events in 1979 which indicated that the IBM 3031 Central Processor was a half step or mini-generation improvement of the IBM 370/148 Central Processor. The IBM 3031 was introduced with a low purchase-lease ratio, a factor used in the industry to determine the expected system life of IBM products. Indeed, the IBM 3031 went out of production in 1980, in part because the IBM 4300 was announced in January 1979. Lastly, there is no other explanation within this record to indicate the rationale of Finalco to structure the interim revenue provisions to commence after the 48th month, other than the obvious conclusion that Finalco determined that the Anaconda equipment would not realistically retain significant residual value. Based on these factors, we determine that the Anaconda equipment as of August 1979, would reasonably be expected to generate $7,500 of interim revenue for petitioner during the period from August 31, 1983, to August 31, 1987,[21] and retain a residual value of $15,000 at the termination of the owner lease in August 31, 1987. We have found the residual value of the Anaconda equipment at the termination of the owner lease in August 1987 to be $15,000, and such residual value to be $15,000 at the commencement of the interim revenue provisions in August 1983. Petitioner failed to establish the necessary burden of proof as to any reasonable rentals during the interim revenue period. The term of rental sharing is quite long, and we refuse to make the necessary assumption, particularly where peripheral computer equipment resembles a flat life curve during the later periods of economic life. Based on these findings, the Anaconda transaction was not imbued with economic substance and is to be disregarded for Federal income tax purposes.[22]

We are satisfied that as of December 1979, the Irving 1 equipment and the Irving 2 equipment would realistically

---

[21]We accept Morgan's view that the residual value at such time would be $15,000. Petitioner was entitled to 50 percent of any rent received by Finalco. We simply assume a pro rata portion of the interim revenue period residual value to be received by petitioner.

[22]Net equity

| | |
|---|---|
| Recourse note | $23,000 |
| Less rental received | 7,500 |
| 120 percent times | 15,500 |
| Petitioner's net equity | $18,600 |

retain sufficient residual value to imbue each transaction with economic substance, without regard as to whether interim revenue was received by petitioner.[23] The Irving 1 equipment included four IBM 3803-2 tape control units with two switch options. Lyons concluded that the December 1987 residual value of the Irving 1 equipment would be within the range of $40,000 to $60,000, or within 20 to 30 percent of the IBM list price. The IBM 3803-2 tape control unit was initially available for delivery in 1973; however, such model was designed to operate within the range of IBM

| | |
|---|---:|
| Residual value | $15,000 |
| Petitioner | 15,000 |
| Finalco | 0 |
| | 15,000 |
| Petitioner's economic profit | |
| Interim revenue | 7,500 |
| Residual revenue | 15,000 |
| Less remarketing fee | (1,500) |
| (10 percent) | 21,000 |
| Petitioner's investment | |
| Recourse note | 23,000 |
| Interest on recourse note | 8,710 |
| | 31,710 |

[23]Based on our review of the record, we determine that the interest of Comdisco in the Irving equipment pursuant to the Comdisco management and remarketing agreement was intended to provide a benefit to Comdisco where the end-user executed a renewal of the end-user lease. Comdisco located the end-user and installed the equipment. The end-user aspect of the transaction was completed as of the date of transfer to Finalco through Blackwood. The end-user lease was a triple-net 36-month lease. The Comdisco management and remarketing agreement was to terminate Nov. 30, 1986. The owner lease with Finalco was a 96-month lease to terminate Nov. 30, 1987. We are certain that Comdisco required the Comdisco management and remarketing agreement as a condition of sale to Finalco. Phillip Hewes, the Comdisco staff attorney who drafted the Comdisco management and remarketing agreement, provided no testimony as to whether Comdisco intended to solicit offers on behalf of petitioner other than from the end-user. In our analysis, we determine that Finalco would execute any sale or re-lease of the Irving equipment at the termination of the owner lease.

Our conclusion is that Comdisco intended to benefit solely from any sale or re-lease of the Irving equipment to the end-user, or immediately upon termination of the end-user lease in November 1982. The Comdisco management and remarketing agreement was to expire in November 1986. In our view, Comdisco realistically expected to benefit from any end-user lease extension. We are certain that Comdisco had no intention of dealing with petitioner, where the Irving equipment was no longer on lease to Irving. We find no evidence that Comdisco would remain interested in remarketing the Irving equipment after such time as Comdisco was not able to sell or re-lease the Irving equipment subsequent to the termination of the end-user. Notwithstanding the testimony of Olmstead, the remarketing terms of the purchase agreements are not clear as to whether Finalco is entitled to remarketing compensation concerning "renewals under the lease" or "referral of a willing buyer or seller" where the end-user renewed the Irving equipment during the terms of the Comdisco management and remarketing agreement. We note that as to petitioner, Finalco delivered the end user, not Comdisco.

computers including the 360 Series, 370 Series, the 3030 Computer, the 3080 Computer, and the 4300 Series. Lyons concluded that the residual value of the IBM 3803-2 would retain the residual value set forth, because tape drives and tape control peripherals retain more value than other peripheral devices. Lyons' view was that the technology of tape drives and tape control peripherals was not subject to rapid obsolescence due to new product advancements. Lyons stated that in 1979, the industry experts expected IBM to develop higher performance tape drive peripherals, but that to predict new product developments of IBM "five weeks from now much less five years from now is very difficult" and that to predict IBM 5-year product developments "is really fantasizing." IBM introduced a new tape generation, the IBM 3480, which was announced in March 1984. The IBM 3480 stored data on magnetic cartridges instead of the customary reels. Due to certain IBM introduction difficulties and customer reluctance to abandon the reels, the fair market value of the Irving 1 equipment during 1985 was $165,456, or 80 percent of the IBM list price.[24] We are persuaded by Lyons that in December 1979, the technology of the IBM 3803-2 tape control unit was not subject to rapid obsolescence and would retain sufficient residual value due to the compatibility of the IBM 3803-2 tape control unit within the wide range of IBM computer products.

The Irving 2 equipment included five IBM 3350-C2 disk drive units with the 8150 strong switch. As of December 1979, Lyons concluded that the December 1, 1987, residual value would realistically be within the range of $35,000 to $55,000, or 15 to 25 percent of the IBM list price. The IBM 3350-C2 disk drive was introduced in the market in 1976, and included the new "Winchester" technology which served as displacement technology for magnetic tape mem-

[24]Morgan described petitioner as being "lucky" in that the 1985 residual value of the Irving 1 equipment was significant. On brief, petitioner denigrates Morgan's view that such occurrence was pure chance. We agree with Morgan that petitioner was certainly benefited by fortuitous events. Petitioner formed no subject intent to acquire certain peripheral items, such as tape drives as opposed to memory devices, and merely accepted the transactions as selected and structured by Finalco based solely on the cash or cash equivalent investment cost. Petitioner benefited in two pertinent aspects; (1) IBM encountered difficulty with the introduction of the new IBM 3480; and (2) petitioner's transaction included the tape control units. We are confident both aspects were purely fortuitous occurrences.

ory. The Winchester disk drive memory provided much faster access than magnetic tape memory. The IBM 3350-C2 was designed to operate within the wide range of IBM computers including the 360 Series, 370 Series, the 3030 Computer, the 3080 Computer, and the 4300 Series. The IBM 3350 disk drive provided a substantial step in technology in comparison to previous IBM disks such as the IBM 2311, 2314, and 3330, because of the higher performance and the density of stored data. We are satisfied that as of December 1979, the Irving 2 equipment would realistically retain residual value within the range offered by Lyons, and that the transaction was imbued with economic substance.

In stark contrast to the Anaconda transaction, the Irving 1 agreement and the Irving 2 agreement provided that interim revenue-sharing would commence after the 84th month of the 96-month owner lease. As in the Anaconda transaction, Lyons provided no contingent interim revenue opinion evidence. In the Irving transactions, we found sufficient residual value to imbue the transactions with economic substance based on the opinion evidence of the technology at issue. Given the short 1-year contingent interim revenue period and our determination as to the value of the Irving equipment at issue, the record provided sufficient evidence to find economic substance. In the Anaconda transaction, we were not persuaded as to the value of the technology at issue and found particularly fatal, to the finding of economic substance, Lyon's omission of interim revenue opinion evidence.

### Benefits and Burdens of Ownership

The second issue for decision is whether petitioner held sufficient benefits and burdens of ownership to be regarded as the owner of the computer equipment for Federal income tax purposes. Our holding that the Irving transactions in question are not tax-avoidance schemes devoid of economic substance does not foreclose further discussion of whether the form of such transactions must be accepted for Federal tax purposes. *Packard v. Commissioner,* 85 T.C. 397, 419 (1985), citing *Commissioner v. Court Holding Co.,* 324 U.S.

331, 334 (1945).[25] Respondent contends that petitioner does not possess sufficient attributes of ownership to be considered the owner of the computer equipment. Petitioner's position, of course, is to the contrary.

In *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237 (1981), we stated:

> The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. *Commissioner v. Brown,* 380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * * to petitioners. This is a question of fact which must be ascertained from the intention of the parties, as evidenced by the written agreements, read in light of the attending facts and circumstances. *Haggard v. Commissioner,* 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). * * * [Fn. ref. omitted.]

We are satisfied that petitioner acquired the benefits and burdens of ownership and retained "significant and genuine attributes of the traditional lessor." *Frank Lyon Co. v. United States,* 435 U.S. at 585. In *Estate of Thomas v. Commissioner,* 84 T.C. 412 (1985), we looked to the facts of *Frank Lyon Co.* as establishing a level of ownership attributes necessary to satisfy the requirements of ownership for Federal tax purposes.

In *Estate of Thomas,* we found the following factors to be essentially neutral in making the determination of whether a taxpayer is the owner of property: (1) The existence of a net lease, 84 T.C. at 433; (2) the absence of significant positive net cash-flow during the leaseback term or rent geared to interest and mortgage amortization, 84 T.C. at 434; and (3) the use of nonrecourse liability, 84 T.C. at 436. Factors which we found to be relevant to the determination of ownership included (1) the taxpayer's equity interest in the property as a percent of the purchase price, 84 T.C. at 436; (2) the existence of useful life of the property in excess of the leaseback term, 84 T.C. at 436; (3) renewal rental at the end of the leaseback term set at fair market rent, 84 T.C. at 436; and (4) the expectation of a "turnaround" point which would result in the investors' realizing income in

---

[25]We have determined that the Hon transaction and the Anaconda transaction were tax-avoidance schemes devoid of economic substance. Consequently, we need not further discuss the benefits and burdens of ownership with respect to such transactions.

excess of deductions in the later years, and net tax benefits during the leaseback term less than the unrecovered cash investment, 84 T.C. at 438.

In *Frank Lyon Co.*, the taxpayer's cash investment in the property subject to a leaseback was approximately 6 percent. In the Irving transactions at issue, petitioner's cash investment was approximately 15 percent. Similarly, in *Frank Lyon Co.*, the potential lease term approximated the useful life of the property involved, whereas the record here indicates that the technological usefulness of the Irving equipment would exceed the 8-year owner leases. We are satisfied, due to the interest of Finalco in the residual sharing agreement, that any renewal rents or the eventual sale structured by Finalco concerning the Irving equipment at the end of the owner leases would be fair market value. The Irving transactions were structured by Finalco to "turn around" during the year 1984, at which time petitioner would realize taxable income for the years 1984 through 1987, inclusive, and that net tax benefits during the leaseback term of the owner leases were less than petitioner's cash investment. We are, therefore, satisfied that the form of the Irving transactions were within the standard set forth in *Estate of Thomas*. See also *Mukerji v. Commissioner*, 87 T.C. at 967-968.

Respondent relies on *Falsetti v. Commissioner*, 85 T.C. 332 (1985), for the assertion that petitioner did not acquire the benefits and burdens of ownership. In *Falsetti*, we set forth a working definition of a "sham in substance" as the "expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." *Falsetti v. Commissioner*, 85 T.C. at 347. For the reasons we set forth to determine that the Irving transactions were supported with economic substance, and for such reasons set forth concerning the attributes of ownership viewed in the context of *Estate of Thomas*, we do not find respondent's assertion of the "sham in substance" analysis of *Falsetti* to be applicable here.

### Depreciable Interest

Respondent asserts that the ownership interest acquired was not a present depreciable interest but was a future interest in the residual value of the Irving equipment. Respondent relies on *Coleman v. Commissioner*, 87 T.C. 178 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987), for such assertion. In *Coleman,* we held that the unconditional and consistently confirmed vesting of title in the lenders for a bona fide purpose created a situation in which respondent made a prima facie case that a certain leasing company was not the owner of the computer equipment for purposes of depreciation, and that the taxpayers, who claimed ownership through such leasing company, did not satisfy the burden of proof that other elements of the burdens and benefits of ownership were evident in the interest the taxpayer acquired. *Coleman v. Commissioner,* 87 T.C. at 204. The instant case is clearly distinguishable from *Coleman.* We are satisfied that petitioner acquired a present depreciable interest in the Irving transactions. *Mukerji v. Commissioner,* 87 T.C. at 968 n. 33; *Estate of Thomas v. Commissioner, supra.*

### Interest Deduction Pursuant to Section 163

Respondent asserts that petitioner is not entitled to deduct interest pursuant to section 163 on the installment notes because the amount of the nonrecourse debt exceeds the value of the Irving equipment to petitioner. We disagree. In *Rice's Toyota World, Inc.,* we stated that a genuine indebtedness supported by actual investment is strong evidence of economic substance. *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. at 209. The parties agreed that petitioner paid fair market value to acquire the equipment in the Irving transactions. We performed an objective analysis and determined that the residual value of the equipment in the Irving transactions was sufficient to support the transactions with economic substance notwithstanding the interests of Finalco in the remarketing agreement and the residual sharing agreement. Our analysis assumed as appropriate that Finalco would receive a 10-percent remarketing fee and a 20-percent residual inter-

est. Consequently, we determine that the prudent abandonment analysis is not applicable and that the nonrecourse installment note represented a genuine debt so that interest paid thereunder is deductible. *Mukerji v. Commissioner,* 87 T.C. at 968 n. 34.

Petitioner is also entitled to deduct interest paid with respect to the recourse notes in the Hon transaction and the Anaconda transaction. In *Rice's Toyota World, Inc.,* the Court of Appeals for the Fourth Circuit held that a sham determination did not preclude the deduction of interest paid on a recourse installment note. *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d at 96. In *Rose v. Commissioner,* 88 T.C. 386, 423 (1987), we adopted the view of the Court of Appeals for the Fourth Circuit. Consequently, petitioner is entitled to deduct the interest amount paid on the recourse notes in the Hon transaction and the Anaconda transaction, even though we have determined such transactions to be devoid of economic substance.

## At-Risk Issues Pursuant to Section 465

Respondent asserts that petitioner was not at risk within the meaning of section 465(b)(3)(A) for the amount of the recourse notes executed in favor of Finalco, because Finalco retained an interest in the activity other than that of a creditor. Section 465(c)(1)(C) includes the leasing of any section 1245 property among the activities to which section 465(a) refers. We have held that the requisite interest other than as a creditor must be either a capital interest in the activity, or an interest in the net profits of the activity. *Jackson v. Commissioner,* 86 T.C. 492, 529 (1986).[26] Respon-

---

[26]The Commissioner issued proposed regulations applicable to sec. 465(b)(3)(A) on June 5, 1979, which provide in pertinent part:

(b) *Loans for which the borrower is personally liable for repayment*—(1) *General rule.* If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity.

(2) *Capital interest.* For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation.

(3) *Interest in net profits.* For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose

dent contends that the interest of Finalco in the remarketing agreements and in the residual sharing agreements regarding interim revenue and residual revenue create in Finalco interests other than that of a creditor. Respondent, however, does not set forth any argument as to whether such interests of Finalco constitute the requisite capital interest or the requisite net-profits interest. Respondent merely recites the applicable provisions of the proposed regulations and the pertinent portions of the relevant agreements between Finalco and petitioner. In *Bussing v. Commissioner,* 88 T.C. 449, 460 (1987), supplemental opinion 89 T.C. 1050 (1987), we determined that the substance of the transaction was that the parties were engaged in a joint venture to invest, to lease, and to market certain computer equipment. In that case, we determined that the party which structured and arranged the leveraged lease had an interest, as the managing partner, in income derived from subleasing the equipment and from the residual value of the equipment, and that such interest was an interest other than that of a creditor within the meaning of section 465(b)(3)(A). *Bussing v. Commissioner,* 88 T.C. at 463 n. 14. Such is not the substance of the case before us. Neither the remarketing agreement nor the residual sharing agreement creates a capital interest or net-profits interest in Finalco within the meaning of section 465(b)(3)(A). We find that Finalco's residual revenue interest is not a capital interest, because Finalco's interest in the residual revenue, if any, regarding the equipment, is not distributable upon liquidation of the activity in all instances, because petitioner must receive 120 percent of net equity prior to any amount accruing to the benefit of Finalco. Furthermore, Finalco and petitioner are not partners of a partnership or shareholders of a corporation described in section 1371(b). Compare *Bussing v. Commissioner, supra.*[27]

The remarketing agreement provides that Finalco receive a commission where remarketing services are performed based on a percentage of gross remarketing revenue. The remarketing agreement does not provide Finalco a net-

---

compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.

[Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32,239 (June 5, 1979).]

[27]Sec. 1.465-8(b)(2), Proposed Income Tax Regs.

profits interest. Compare *Waddell v. Commissioner,* 86 T.C. 848, 915 (1986). We conclude that petitioner was at risk within the meaning of section 465(b)(3)(A) with respect to the recourse notes executed in favor of Finalco for Irving 1 and Irving 2.

Section 465 provides that, where an individual invests in certain activities including the leasing of section 1245 property, any loss from such an investment shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(C). Borrowed amounts are considered to be at risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2).

A further requirement with respect to amounts borrowed for which a taxpayer will be considered at risk is set forth in section 465(b)(4). Such section provides that amounts which are "protected against loss" are not considered at risk, as follows:

SEC. 465(b). AMOUNTS CONSIDERED AT RISK.—

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similiar arrangements.

The legislative history of section 465(b)(4) indicates that "other similiar arrangements" concern situations where a taxpayer is effectively immunized from any realistic possibility of suffering an economic loss, even though the underlying transaction was not profitable.[28] Such situations include nonrecourse financing, various insurance agreements, stop loss agreements, and other similiar arrange-

[28]The Senate Finance Committee report states:

"Also, under these rules, a taxpayer's capital is not 'at risk' in the business * * * to the extent he is protected against economic loss * * * by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not 'at risk' if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87; fn. ref. omitted.]"

ments for compensation or reimbursement. *Porreca v. Commissioner*, 86 T.C. 821, 838 (1986).

Where a taxpayer's debt obligation constitutes only a secondary liability under which the taxpayer has a right of reimbursement against the primary obligor, the taxpayer will not be treated as at risk with respect to any such obligation, as such reimbursement is regarded as protection against loss within the meaning of section 465(b)(4). *Peters v. Commissioner*, 89 T.C. 423 (1987); *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

Respondent asserts that petitioner was not at risk with respect to the Irving 1 assumption in the amount of $44,377, and the Irving 2 assumption in the amount of $73,866, because petitioner was protected against loss within the meaning of section 465(b)(4). Respondent asserts that the binding contractual terms of the purchase agreements protect petitioner against economic loss, due to a covenant of reimbursement arising from any default of Finalco. Respondent also asserts that the assumption agreements, in substance, created a guarantee such that petitioner was a guarantor. Lastly, respondent asserts that the assumption agreements were devices designed to have the effect of avoiding the at-risk provisions of section 465, and are to be disregarded. We agree with each assertion of respondent.

The purchase agreements executed by petitioner to acquire the Irving 1 equipment and the Irving 2 equipment provided that petitioner assume certain Finalco obligations owed to Citicorp, as lender of funds to Comdisco, which Blackwood assumed pursuant to the Comdisco purchase agreement and assigned to Finalco. Within paragraph (9) of the purchase agreements concerning the Irving transactions, Finalco covenants to petitioner that Finalco shall fully pay and perform any and all obligations, liabilities, and indebtedness secured by any liens when due, and eliminate all such liens when the installment notes and recourse notes are satisfied. Within paragraph (12) of such purchase agreements, Finalco agreed to indemnify petitioner against any cost which petitioner might incur by reason of any breach by Finalco of any covenant within the purchase agreements. In our view, the terms of the purchase agree-

ments concerning the Irving transactions protect petitioner against any economic loss within the ambit of an "other similiar arrangement." Sec. 465(b)(4).

According to the terms of the Irving 1 assumption and the Irving 2 assumption, petitioner agreed to assume the obligation of Finalco, owed to Citicorp as the lender of funds to Comdisco as the original obligor, upon the same nonrecourse terms and conditions provided therein except that petitioner's assumption was to be on a full recourse basis as to the assumed amount. It is obvious that petitioner must satisfy the assumed amounts on a personal recourse basis only where Finalco is in default. Finalco convenants that Finalco will satisfy the debt owed to Citicorp within the purchase agreements, and further agrees to indemnify petitioner for any expense due to breach of any covenant within the purchase agreements. The contractual terms of the purchase agreements protect petitioner against any economic loss so as to constitute a similiar arrangement within the meaning of section 465(b)(4). Citicorp, as lender, provided a nonrecourse financing secured by the equipment and the end-user lease without concern as to personal liability. Neither Citicorp, as lender, nor Comdisco, as original obligor, signed the Irving assumptions. It is clear that Citicorp viewed the Irving equipment and leases as sufficient security, and that petitioner's liability for the assumed amount became operative only where Finalco defaulted on the Citicorp note. We are convinced that Citicorp viewed Finalco as the primary obligor. See *Peters v. Commissioner, supra.*

We also agree with respondent that the substance of the assumption agreements merely established a guarantee arrangement. Presented with similiar facts and circumstances, we have characterized the form of an "assumption" agreement to be, in substance, a guaranty of a lessor merely to satisfy any default by the lessee. *Coleman' v. Commissioner,* 87 T.C. at 206. Petitioner asserts the status of primary obligor. While the form of the assumption is that petitioner does not have a right of subrogation against a primary obligor, the substance of the transaction is such that petitioner was not intended to be a primary obligor and was protected against any economic loss. We find the

substance of the assumption agreements to merely create a guarantee arrangement. *Coleman v. Commissioner*, 87 T.C. at 206 n. 21.

We also agree with respondent's assertion that assumption agreements were devices designed to have the effect of avoiding the at-risk provisions of section 465, so as to be disregarded for Federal income tax purposes. See *Bussing v. Commissioner, supra; Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986); *Law v. Commissioner*, 86 T.C. 1065 (1986). Section 1.465-4(a), Proposed Income Tax Regs., provides that where a taxpayer engages in a pattern of conduct which has the effect of avoiding the provisions of section 465, the amount considered at risk may be adjusted to reflect more accurately the amount which is actually at risk. Facts and circumstances set forth as relevant to such determination include the nature of the activity and deviations from normal business practice and the contractual arrangements between the parties. Sec. 1.465-4(b)(2),(4), Proposed Income Tax Regs. We find that the assumption agreements were mere devices designed solely to avoid the at-risk provisions of section 465. *Peters v. Commissioner, supra; Bussing v. Commissioner, supra; Tolwinsky v. Commissioner, supra.* In the context of this case, we are also certain the facts and circumstances surrounding the assumption agreements were not consistent with normal commercial lending practices due to the disinterest of Citicorp, the lender, and that the execution of the assumption agreements was "at most lagniappe.'" *Peters v. Commissioner, supra.* Compare *Gefen v. Commissioner*, 87 T.C. 1471 (1986); *Abramson v. Commissioner*, 86 T.C. 360 (1986).[29]

We found the testimony of Olmstead that the lenders required the assumption agreements as additional collateral to be totally self-serving and not credible. We hold that the assumed amount was determined by Finalco solely to provide a sufficient at-risk amount for purposes of section 465, and that the assumption agreements served no other business purpose than as a device designed to enable the transaction to satisfy the at-risk requirements of section 465.

---

[29]Compare *Ockels v. Commissioner*, T.C. Memo. 1987-507.

## Half-Year Convention

The next issue for our determination is whether petitioner was entitled to elect the half-year convention method of section 1.167(a)-11(c)(2)(iii), Income Tax Regs., for the taxable year 1979.[30] Respondent asserts that petitioner did not acquire an ownership interest in the equipment during the year 1979 where certain transactional documents were executed after such year. Respondent does not challenge whether petitioner properly elected the use of CLADR. Compare *Fuentes v. Commissioner,* 85 T.C. 657 (1985).

Section 167(m)(1) provides that, in the case of a taxpayer who has so elected, the term "reasonable allowance" means with respect to property for which a class life has been prescribed, an allowance based on the class life which reasonably reflects the anticipated useful life of that class of property. The regulations under this section permit the use of a half-year convention or modified half-year convention to compute the depreciation deduction for the first year the asset is placed in service. Section 1.167(a)-11(c)(2)(i), Income Tax Regs., allows a taxpayer who has properly elected the CLADR system to adopt the half-year convention provided in section 1.167(a)-11(c)(2)(iii), Income Tax Regs. Pursuant to the half-year convention, depreciation for a CLADR vintage account[31] is determined by treating all property which is placed in service during a taxable year as placed in service on the first day of the second half of the taxable year. While we agree with respondent that the dating practices of Finalco obfuscate the actual date of agreement and are susceptible to the obvious potential for abuse, we are persuaded that petitioner acquired an ownership interest in the Irving equipment for Federal tax purposes during December of 1979. The purchase agreements were executed on December 20, 1979. Finalco deposited petitioner's initial payment on the recourse notes in its bank account on December 27, 1979. Although certain pertinent documents were executed after the close of the taxable year, the

---

[30]Based on our determinations that the Hon transaction and the Anaconda transaction were not supported with economic substance, we do not address whether such equipment was new equipment for purposes of the election of the double-declining-balance method of depreciation.

[31]See sec. 1.167(a)-11(b)(3), Income Tax Regs.

ownership interest attached and the equipment was placed in service during December 1979.

Respondent asserts, in the alternative, that petitioner is not entitled to claim depreciation pursuant to the half-year convention for the taxable year 1979 for any month prior to the month petitioner engaged in the specific trade or business of equipment leasing. We have determined that petitioner acquired and placed in service the Irving equipment during December 1979. Respondent relies on section 1.167(a)-11(c)(2)(iv)(c), Income Tax Regs., which provides as follows:

(c) For purposes of this subparagraph, for property placed in service after November 14, 1979, * * * the taxable year of the person placing such property in service does not include any month before the month in which the person begins engaging in a trade or business or holding depreciable property for the production of income.[32]

Petitioner contends that respondent has ignored the fact that petitioner was engaged in a trade or business as a self-employed consulting geologist during the entire calendar years 1979 and 1980. Petitioner held depreciable real property and other depreciable assets for the production of income during the entire calendar years 1979 and 1980. Petitioner asserts that the fact that petitioner did not engage in the specific trade or business of equipment leasing prior to December 1979 is not relevant to the determination as to whether petitioner engaged in a trade or business for purposes of the election of the half-year

---

[32]Respondent published in the Federal Register (44 Fed. Reg. 65777) on Nov. 15, 1979, sec. 1.167(a)-11(c)(2)(iv), Proposed Income Tax Regs., as follows:

(c) *Manner of determining allowance.* * * *

(2) *Conventions applied to additions and retirements.* * * *

(iv) *Rules of application.* * * * For purposes of this subparagraph, for property placed in service after November 14, 1979, the taxable year does not include any period before the person begins engaging in a trade or business or holding depreciable property for the production of income. In the case of a taxable year of other than 12 full calendar months, the first half of such taxable year shall be deemed to expire at the close of the last day of a calendar month which is the closest such last day to the middle of such taxable year and the second half of such taxable year shall be deemed to begin the day after the expiration of the first half of such taxable year. If a taxable year consists of a period which includes only 1 calendar month, the first half of the taxable year shall be deemed to expire on the first day which is nearest to the midpoint of the month, and the second half of the taxable year shall begin the day after the expiration of the first half of the month. For example, assume that a calendar year corporate taxpayer comes into existence (within the meaning of sec. 1.6012-2(a)(2)) on July 1, 1980, and begins business September 1, 1981. For purposes of applying the conventions under this section, the 1981 taxable year is treated as consisting of 4 months. The first half of the taxable year ends on October 31, 1981, and the second half begins on November 1, 1981.

convention without limitation as to the duration of the taxable year pursuant to section 1.167(a)-11(c)(2)(iv)(*c*), Income Tax Regs. We disagree. The applicable regulation provides that the "taxable year of the person placing such property in service does not include *any* month *before* the month in which the person *begins* engaging in a trade or business or holding depreciable property for the production of income." Sec. 1.167(a)-11(c)(2)(iv)(*c*), Income Tax Regs. (Emphasis added.) We adopt a commonsense reading and application of this regulation to require that the half-year convention's benefit is limited to property being placed in service in a trade or business or in an activity or holding for production of income to which the property relates or is directly linked. In this respect, "It is well settled that a taxpayer may engage in more than one trade or business (profession) for income tax purposes." *Butler v. Commissioner*, 36 T.C. 1097, 1107 (1961). We believe it strains credulity to think that a taxpayer who is engaged in one business and who commences an entirely new business or activity for income production totally unrelated to, and unconnected with, the taxpayer's initial activity should have a privilege granted to the former business extended to the latter. In this respect, long-standing principles relating to startup costs would, to say the least, be frustrated. See *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), affd. per curiam 382 U.S. 68 (1965). Petitioner's allusion to a corporate placement is misplaced. Corporations also are taxpayers which may engage in more than one business, and our determination for petitioners here should apply equally there. Consequently, as petitioner was not in the trade or business of equipment leasing until December 1979, an activity completely unrelated to his profession of geology, petitioner has a short taxable year in 1979 with reference to the equipment-leasing activity within the meaning of section 1.167(a)-11(c)(2)(iv)(*c*), Income Tax Regs., and is not privileged to compute depreciation pursuant to the half-year convention.[33]

---

[33]We have recently decided distinguishable cases concerning the application of the short taxable year provisions of sec. 1.167(a)-11(c)(2)(iv), Income Tax Regs., to the trade or business inquiry of certain entities. *Peters v. Commissioner*, 89 T.C. 423 (1987); *Torres v. Commissioner*, 88 T.C. 702 (1987).

By amendment to answer, respondent asserts the increased rate of interest provisions of section 6621(c) attributable to tax-motivated transactions. Respondent bears the burden of proof. Rule 142(a); *Rose v. Commissioner,* 88 T.C. 386 (1987); *Zirker v. Commissioner,* 87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions. A substantial underpayment exists where such underpayment attributable to a tax-motivated transaction exceeds $1,000. Sec. 6621(c)(2). Section 6621(c) is applicable solely with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986).

Respondent asserts that the transactions at issue are defined as tax-motivated transactions where certain losses were disallowed by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). We have determined that petitioner was not at risk within the meaning of section 465(b)(4) for the assumed amounts indicated in the Irving assumptions. The underpayment attributable to the disallowance of losses by reason of section 465 in the Irving transactions is a substantial underpayment of tax attributable to a tax-motivated transaction. We conclude that petitioner is liable for the additional interest within the meaning of section 6621(c) attributable to the disallowance of losses by reason of section 465(a) in the Irving transactions.

We have determined that the Hon transaction and the Anaconda transaction were tax-motivated schemes devoid of economic substance. Section 6621(c)(3)(A)(v) was added by Congress specifically to include within the definition of tax-motivated transactions "any sham or fraudulent transaction."[34] We have previously determined that "any sham or fraudulent transaction" within the meaning of section 6621(c)(3)(A)(v) includes a transaction which lacked subject profit motive and which was without economic substance. *Patin v. Commissioner,* 88 T.C. 1086, 1128-1129 (1987). We

---

[34]Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750.

have recently determined that the presence of profit motive does not preclude the determination that a transaction lacks economic substance and is, therefore, a sham. *Cherin v. Commissioner*, 89 T.C. 986 (1987). In this case, we determined that petitioner did not manifest a subjective profit motive and that the Hon transaction and the Anaconda transaction were not supported with economic substance. Consequently, petitioner is liable for additional interest on the substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v) where the Hon transaction and the Anaconda transaction are transactions determined to be shams or fraudulent transactions.

*Decision will be entered under Rule 155.*