JONAS R. BRYANT and CARMEN L. BRYANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bryant v. Commissioner
Docket No. 3013-85
United States Tax Court
T.C. Memo 1989-527; 1989 Tax Ct. Memo LEXIS 527; 58 T.C.M. (CCH) 235; T.C.M. (RIA) 89527; September 27, 1989
Burgess L. Doan and Marvin L. Martin, for the petitioners. Andrew M. Winkler, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By two notices of deficiency dated November 27, 1984, respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
Jonas R. Bryant
1979
$ 203,492.52
Jonas R. and Carmen L.
Bryant
1982
9,088.00
The issues for decision are: (1) whether petitioner's [1] mining activities were a sham and lacked economic substance; (2) whether certain *531 amounts expended by petitioner in 1979 and 1982 were deductible as mine development expenditures pursuant to section 616(a); [2] (3) whether petitioner was at risk under section 465 for amounts borrowed in connection with his mining investments; (4) whether petitioners were entitled to an interest deduction in 1982 for a claimed payment of interest on a promissory note; and (5) whether certain miscellaneous business expenses claimed by petitioners in 1982 were ordinary and necessary business expenses. FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulation of facts and first supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Background
Petitioners resided in Bardstown, Kentucky, when they filed their petition. *532 Petitioner holds a bachelor's degree in Ceramic Engineering from Virginia Technological University and a master's degree in Business Administration from Rutgers University. Petitioner also has earned some credit towards a Ph.D. in Business Administration from the University of Southern California. In September 1978, Hitachi Metals Corporation (Hitachi) purchased petitioner's closely held business, American Magnetics Corporation (American Magnetics). Petitioner owned 56 percent of the stock in American Magnetics; Alan Brown (Brown) and Charles Repenn (Repenn) held the remaining 44 percent. As part of the sale of American Magnetics to Hitachi, petitioner entered into a 5-year employment contract with Hitachi to manage its newly purchased plant. In 1979, petitioner requested that Hitachi shorten the length of his employment contract, which it did. Petitioner worked for Hitachi from September 1978 until mid-1980, although he stopped actively working in 1979. Petitioner's sale of his American Magnetics stock resulted in a long-term capital gain in his 1978 taxable year. In 1978, petitioner invested in a cattle feeding operation that resulted in a loss for that taxable year. In 1979, *533 petitioner recognized a gain of $ 331,214 from his cattle feeding investment. Since 1982, petitioner has been employed as vice president and general manager of the ceramic operations for Crucible Materials Corporation in Elizabethtown, Kentucky. The Austin Silver Mine
The Investment
In early 1979, petitioner's former business associate Brown went to Austin, Nevada, to investigate a silver mining investment opportunity. Brown spent a week investigating the Austin Silver Mine (Austin Mine) and interviewing William Noack (Noack), the miner in charge. Brown returned from his trip enthusiastic about the investment and brought back geological reports and other engineering data that petitioner studied. In March 1979, petitioner, along with Brown and Repenn, met with American Magnetic's former certified public accountant to discuss the financial implications of investing in the Austin Mine. Petitioner, Brown, and Repenn also reviewed the investment with American Magnetic's former attorney. Based upon Brown's enthusiastic report, his review of the data brought back by Brown, and his discussions with his C.P.A. and with his attorney, petitioner decided to invest in the Austin *534 Mine, as did Brown and Repenn. Petitioner then requested that Robert Hughes (Hughes), who was marketing the Austin Mine investment, come to Indiana to discuss the details of the investment program with him. Hughes' presentation included a discussion of the favorable tax benefits of an investment in the Austin Mine. On March 27, 1979, petitioner executed the following documents in connection with his subscription to the Austin Silver Program: 1. Appointment of Agent and Authorization to Negotiate -- Petitioner appointed The Equitable Corporation (Equitable) as his agent to negotiate with Argus Resources, Inc. (Argus), the mineral claim owner, for silver recovery rights and to obtain mineral lease approval to remove 83,600 troy ounces from silver-bearing ore material in the leased property. Petitioner also authorized Equitable to arrange for an independent miner to develop the mine property in preparation for being mined and to mine, mill, and refine petitioner's ore. Equitable was to contract with the independent miner for $ 380,000 of development work. 2. Mineral Claim Lease -- between Argus, as lessor, and petitioner, as lessee/miner, for "sufficient silver-bearing *535 material to produce by good mining methods 83,600 troy ounces of .999 silver on the 29 patented mining claims of the Kilborn and Patriot Groups, Lander County, Reese River Mining District, Austin, Nevada." The lease was in consideration of "one dollar and other valuable consideration * * *." The lease was to terminate after the time necessary to mine and mill (as amended on October 8, 1981) the specified silver or 5 years, whichever occurred sooner. The lease provided for petitioner to pay Argus a royalty of 5 percent "of the market price recovered silver 'at site' after first deducting taxes due the State of Nevada or Lander County, Nevada." 3. $ 285,000 Promissory Note -- from petitioner, as payor, to Equitable, as payee. The note provided for payments of $ 95,000 each on June 1, 1980, 1981 and 1982, with interest at the prime rate as established by Chase Manhattan Bank, N.Y., New York plus one-quarter (1/4) percent. The note also provided that all payments were to be applied against interest first, with the balance, if any, applied against principal. 4. Subscription Form -- instructing Equitable, as petitioner's agent, to deliver the $ 95,000 in cash and the $ 285,000 *536 note to an independent miner for the development of petitioner's mining property. This form provided a commission fee of 2 percent of the market value of silver, when produced. 5. Mining Contract -- between petitioner, as lessee, and Manhattan Consolidated Gold Mines, Inc. (Manhattan), as miner. The contract authorized Manhattan to perform $ 380,000 in development work and to remove 83,600 troy ounces of silver for petitioner. On March 27, 1979, a note was executed by Hughes as president for Equitable to Manhattan for $ 285,000. The note provided for three payments of $ 95,000 on March 27, 1980, March 27, 1981, and March 27, 1982, with interest at the prime rate plus 1/8 percent as established by Chase Manhattan Bank, New York. The note was marked "Paid 12-7-79" over the signature stamp of Noack. Petitioner made the following payments to Equitable in connection with his Austin Mine investment: Date of
Check
Amount
Description
3/27/79
$ 95,000.00 silver mine development work
12/30/80
61,152.05 one half silver development note & interest
12/29/82
10,000.00 interest for Austin notes
12/27/83
19,300.00 interest on Austin Silver notes
*537 On October 22, 1985, petitioner executed a new promissory note to Equitable for $ 237,500. The note provided for interest of 8 percent per annum and a due date of October 22, 1995. The note further provided that it was secured by a mortgage. The mortgage, also dated October 22, 1985, was between petitioner, as mortgagor, and Equitable, as mortgagee. The mortgage conveyed an interest in petitioner's Bardstown, Kentucky, residence to Equitable as security for the payment of petitioner's note. The mortgage was notarized on November 15, 1985. The copy received by Equitable reflected that the mortgage had been recorded in the Nelson County, Kentucky courthouse. Petitioners jointly owned their residence, which was appraised at $ 232,500 on November 14, 1985. Description and Background of the Leased Mineral Claim
The ore blocks leased by petitioner were located west of the Hillside Shaft on the Panamint Vein system. High grade silver was first discovered in the Austin area in the early 1860's. Miners sunk the Hillside Shaft at that time, and the area was heavily mined until the 1880's. The methods used by miners in the 1800's were very expensive compared to methods currently *538 used. Accordingly, only high grade silver ore was mined and milled. Generally, those miners only considered ore containing in excess of 50 ounces of silver per ton to be worth mining. In 1946, the Nevada Equity Mining Company was formed to explore the claims around the Austin area, including the Hillside Shaft, which was cleaned out and rehabilitated. The next major development work was performed by Argus. By letter dated December 7, 1979, Equitable obtained an accounting from Argus detailing the following development work undertaken and completed on petitioner's behalf: Description
Cost
Site Preparation:
Hillside Shaft
$ 25,000
New York Shaft
7,000
$ 32,000
Headframe Base:
Hillside
10,000
New York
5,000
15,000
Decline Shaft:
Hillside 95 ft. at $ 3,000/ft.
285,000
New York 10 ft. at $ 3,000/ft.
30,000
315,000
Roadwork:
Hillside
3,000
New York
2,000
5,000
Metallurgy
2,300
De-Water Shaft
10,700
$ 380,000
Manhattan Consolidated Gold Mines, Inc., also disbursed $ 557,193 during 1980 for the development of the Austin Mine. On January 6, 1981, Argus spun off Manhattan, *539 its wholly owned subsidiary, to its shareholders along with certain assets including the Austin Mine. Manhattan's name was changed to Austin Resources, Inc. (Austin Resources). At a special meeting of directors and shareholders on January 6, 1981, petitioner was elected a director and secretary/treasurer of Austin Resources. William Noack resigned as Manhattan's president at that same meeting. On November 12, 1981, petitioner wrote Robert W. Hughes of Austin Resources and offered to provide management services for them at the Austin Mine for $ 9,000 per month, travel expenses, use of a trailer, and a bonus of 100,000 shares of Austin Resources stock. Austin Resources rejected petitioner's offer because he asked for too much money. Petitioner continued to serve in his capacity as a director and secretary/treasurer. Austin Resources agreed to compensate petitioner $ 25,000 per year, provided there were available funds. Although petitioner has received some of the agreed-to compensation, he has not received the full $ 25,000 in any year. During 1981, Austin's head miner, John Pearce (Pearce), encountered numerous problems in rehabilitating the Hillside Shaft. Consequently, *540 a decision was made to approach Austin's ore deposits, including petitioner's, from the Equity Tunnel. On March 14, 1982, Pearce was crushed to death in the Equity Tunnel by a slab of granite. In May 1982, The Comstock Company (Comstock) was hired to take over the mining from Pearce's group. A decision was then made to return to the Hillside Shaft. Comstock reopened the Hillside Shaft and worked until its funds were exhausted. The Summit Mine
The Investment
In 1982, petitioner decided to invest in the Summit Mine (Summit), another of Equitable's mine investments. Petitioner used the same analyses and evaluations in this decision as he did in his previous mining investments. Summit is located near Kingman, Arizona, and is in the same general area as the Tyro Gold Mine (Tyro), another mine marketed by Equitable in which petitioner invested in 1980. Petitioner visited Summit in 1980 at the same time that he investigated Tyro. Petitioner executed the following documents with respect to his Summit investment: 1. Appointment of Agent and Authorization to Negotiate -- Petitioner appointed Equitable as his agent to negotiate for ore recovery rights and to engage *541 a mine operator to develop and mine Tract 166-4.5 for 1,500 tons of ore. Petitioner also authorized Equitable to engage an independent mining company for $ 60,000. 2. $ 45,000 Promissory Note (dated 12/29/82) -- from petitioner, as maker, to Equitable, as payor. The note provided for interest at 10 percent and a due date of December 15, 1986. The note also stated that all payments were to first be applied to the payment of interest. 3. Mining Contract (dated 12/29/82) -- between petitioner, as Lessee, and American International Minerals Corporation (American International), as Mining Co. The contract authorized American International to perform development work for $ 60,000 and to mine the leased property. The contract provided that American International was to receive 30 percent of the ore mined. Petitioner paid Equitable with a $ 15,000 check dated December 29, 1982, as payment on the investment. Description of the Summit Mine
Summit is located in the Wallapai mining District in Mohave County, Arizona. The mine contained gold and silver ore. As with the Austin and Tyro mines, Summit had previously been mined. Development work at Summit began in 1981. *542 As of October 26, 1984, Keystone Development and Mining, Inc. (Keystone) [3] had expended the following for the development of Summit: Administration
$   393,870
Road Construction
110,000
Ore Bin
7,600
Site Preparation
4,800
Portal Construction
5,300
Haul Tunnel Construction
430,836
Equipment
78,200
Assay Lab
95,750
Drilling - Water for Mill & Lab
15,000
Raw Ore Storage
88,000
Mill Building & Equipment
350,000
Tailings Pond
7,500
Engineering & Independent
Assay Expenses
23,000
$ 1,609,856
As with the Tyro mine, Rocky Camozzi of Gold Standard Mining began the mining operation. After Camozzi became ill, John Pearce, who was also operating the Austin Mine, took over Camozzi's mining contract. When Pearce was killed in the Austin Mine, Keystone took over his mining contract. In June of 1985, Harrison Mining was contracted to refurbish the Summit Mine and develop the ore bodies. Harrison *543 Mining continued to develop the ore bodies and milled a few hundred tons of the ore mined in early 1986. Harrison Mining ceased its operations at Summit in April 1986 because of a lack of funds and stricter Federal regulation. Petitioners' Tax Returns
For the years at issue, petitioners used the cash method of accounting. Petitioner filed his 1979 Federal income tax return as a head of household. On his return, petitioner claimed a $ 380,000 net loss from a mining activity. The loss arose from a claimed deduction under section 616(a) for mine development expenditures. Respondent disallowed petitioner's claimed deduction in its entirety. Petitioners jointly filed their 1982 return and claimed a loss from mining of $ 71,766 as follows: Mine Development
$ 60,000
Dues and Publications
90
Interest
10,000
Office Supplies and Postage
20
Utilities and Telephone
53
Legal and Travel Expenses
1,603
$ 71,766
Respondent entirely disallowed these claimed deductions. OPINION As a preliminary matter we note that respondent also examined petitioners' 1980 and 1981 returns. Although respondent adjusted those returns, he did not determine *544 any deficiency for either year. Accordingly, this Court has no jurisdiction over those years, and we do not address petitioners' arguments for disallowed deductions for 1980 and 1981, including those relating to the Tyro investment. Secs. 6211(a), 6214(a), and 7422. Mine Development Expenditures
Whether Petitioner's Mining Activities Lacked Economic Substance
As a threshold issue, we address respondent's assertion that petitioner's mining activities lacked economic substance, and therefore petitioners are not entitled to tax benefits from such activities. In their brief, petitioners argue that this issue is not properly before the Court because respondent did not raise it in the notice of deficiency or in his answer. We find, however, that the notices of deficiency issued to petitioners in this case were sufficiently broad to encompass this issue. The notices state, inter alia, "Further, you have not established that you acquired an interest in any mineral property, that any mining expenses were paid or incurred, or that the claimed mining transactions occurred or occurred as claimed." (Emphasis supplied.) *545 Therefore, the issue of economic substance was raised in the notice of deficiency. Patin v. Commissioner, 88 T.C. 1086, 1127 n. 33 (1987), affd. sub nom. without opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). Moreover, we find petitioners suffered no surprise or detriment because they were advised of the existence of this issue before the trial and had sufficient time to address it. See Patin v. Commissioner, supra at 1127 n. 33; Sorin v. Commissioner, supra; Foster v. Commissioner, 80 T.C. 34, 220-222 (1983), affd. in part and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985). Respondent argues that, in effect, petitioner's mining activities were a sham. The Court of Appeals for the Sixth Circuit, to which this case is appealable, recently held that *546 the proper inquiry in determining a sham is "whether the transaction had any practicable economic effect other than the creation of economic tax losses." Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987); see also Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. 85 T.C. 127 (1985); Collins v. Commissioner, 857 F.2d 1383, 1385 (6th Cir. 1988), affg. a Memorandum Opinion of this Court. "A taxpayer's subjective business purpose and the transaction's objective economic substance may be relevant to this inquiry." Rose v. Commissioner, 868 F.2d at 853, citing Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988). In Rose v. Commissioner, supra, the Court of Appeals for the Sixth Circuit affirmed this Court's holding that the taxpayers' purchase of reproduction masters of Picasso originals lacked economic substance apart from anticipated tax benefits and that the taxpayers were not entitled to deductions and investment credits on the property acquired. *547 In so holding, the Sixth Circuit focused on this Court's determination that the taxpayers had no honest profit objective and that their venture was completely void of economic substance. Moreover, the Sixth Circuit emphasized our finding that: (1) the taxpayers admitted that tax considerations "played a major part" in their decision to enter into the investment; (2) the taxpayers' investment advisor and tax accountant viewed their roles regarding the taxpayers' investment as advising them on tax shelters; (3) the information on the investment sought and received by the taxpayers "focused primarily on the tax advantages" of the investment; (4) the taxpayers never obtained any independent art appraisals; and (5) the taxpayers never entered into any distribution agreement with anyone to market the items produced from the Picasso packages. 868 F.2d at 854. Furthermore, the Sixth Circuit noted that the taxpayers "blindly accepted the exaggerated values" of the Picasso packages and that all they really purchased were tax losses. *548 868 F.2d at 854. Petitioners argue that their case is distinguishable from Rose v. Commissioner, supra, and that they had a true profit objective with respect to the mining activities and that the mining activities had economic substance. Respondent's determinations are presumed correct, and accordingly, petitioners bear the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Patin v. Commissioner, 88 T.C. at 1127 n. 33; Rule 142(a). Petitioners' arguments center on the profit potential of the investments when petitioner made them. Although petitioner admits that tax benefits played some role in his decision to make the mining investments, he contends that he based his decision primarily on the mining investments' profit potential apart from tax benefits. For example, petitioner claims that at the time he invested in the Austin Mine he projected a potential profit of $ 600,000, exclusive of tax benefits. Moreover, petitioner points to his preliminary investigation of, and his personal involvement with, his mining ventures as indicative of his concern regarding the profit potential and economic viability of his mining *549 investment. Finally, petitioner argues that the failure of his investments to yield profits resulted from a series of circumstances beyond his control, specifically, the illness and subsequent death of Noack, the original operator of the Austin Mine; the accidental death of Pearce, Noack's successor; and the death of Alex Gold, co-owner of Keystone Development. Respondent, on the other hand, contends that petitioner did not make reasonable investigations into the mining programs. Respondent also challenges whether petitioner made the profit projections as claimed. Respondent suggests that petitioner's objective in investing in the mining programs was for the ensuing tax benefits. Furthermore, respondent dismisses petitioner's contention that the mining venture failed because of a series of unexpected illnesses and deaths. Respondent asserts that these circumstances should have at worst resulted in delays, not abandonment of the mining ventures. Because of the similarity of petitioner's investments in the Austin and Summit mines, we shall address them as a whole in our economic substance discussion. We are not unaware of these investments' concomitant tax benefits. Nor, *550 do we think, was petitioner. In 1979, the year petitioner invested in the Austin Mine, petitioner recognized farm income of $ 336,857 from a cattle feeding investment from which petitioner recognized a large loss in 1978, the year petitioner sold his interest in American Magnetics. Moreover, we accord little significance to petitioners' claim that they received no tax benefit in 1980, when their amended return reflected a net operating loss, and little tax benefit in 1982, when they claim their cash payments for interest exceeded any interest. With respect to these years, we note that the net operating loss carryover and carryback provisions of section 172(a) vitiate any significance in looking at the tax ramifications of any particular year. In addition, petitioner, a well-educated and experienced businessman, testified that he liked to "leverage" his investments as much as possible with debt so that he could "stretch" his cash as much as possible. We note that one of the primary benefits of leveraging at that time was the deductibility of interest. See section 163(a). Also, Equitable's letterhead touted that among its products were "tax shelters" and "sheltered investments. *551 " Finally, the Austin Mine was marketed to petitioner, based in part, on its tax benefits. Nevertheless, we cannot hold that petitioner's mining investments lacked economic substance simply because of the existence of tax benefits. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 203 (1983), affd. in part and revd. in part 752 F. 2d 89 (4th Cir. 1985). Because of the spiraling market value of gold and silver during the years at issue, petitioner's investments did have the potential of earning petitioner a profit, apart from tax benefits. Austin Mine
Although we do not arrive at as optimistic a figure as petitioner's projected $ 600,000 profit for the Austin investment, we do find that at the time of his investment petitioner could have reasonably expected a profit, apart from tax benefits. In calculating profitability, we start with the computation made by Earl Harrison (Harrison), petitioners' expert witness. Harrison calculated that petitioner's ore deposit could yield a total of 18,000 tons of silver-producing ore. Harrison then calculated that the ore *552 in petitioner's deposit would yield 15.2 ounces per ton and that, therefore, the ore would yield 273,600 ounces of silver. Harrison based his factor of 15.2 ounces per ton on geological reports prepared by Robert Raring, a respected mining engineer. Using a "flotation system" recovery system, which recovers silver at approximately an 80 percent rate, Harrison calculated that petitioner would end up with 218,880 ounces of silver. Harrison estimated that it would cost $ 1,350,000 (18,000 tons X $ 75 per ton) to produce the silver in petitioner's ore. Harrison then computed two potential net profits assuming a selling price of silver of $ 8 per ounce for 1979, and $ 50 per ounce for 1980. We note, however, several errors in Harrison's computation, for which we shall make adjustments. First, Harrison's calculations contemplate that petitioner was entitled to all the silver ore in his deposit. Petitioner's mineral lease, however, only allows him to remove 83,600 troy ounces. [4] Accordingly, we find that using Harrison's factor of 15.2, petitioner would need to mine 5,500 tons to obtain 83,600 ounces of silver ore. Again using Harrison's recovery rate of 80 percent, we find that the 83,600 *553 ounces of silver ore would produce 66,880 ounces of silver. Our next modification is to the selling price of silver. Harrison used figures of $ 8 and $ 50 per ounce for 1979 and 1980, respectively. Harrison, however, provided no support for these figures. We use instead the average of the sales prices for 1979 and 1980 according to the U.S. Bureau of Mines, $ 15.86. [5] Finally, we allow for the royalty to Argus of 5 percent of the market value of recovered silver under petitioner's mineral lease. After these modifications, we calculate that at the time of his investment petitioner could have objectively expected the following return: Proceeds: 66,880 oz. at $ 15.86/oz.
$ 1,060,716.80
Less: 5% royalty
53,035.84
production costs 5,500 tons at $ 75/ton
412,500.00
initial investment (cash and notes)
380,000.00
$   215,180.96
*554 We also reject respondent's contention that petitioner's failure to introduce projections made at the time of the investment shows a lack of economic substance. Petitioner testified that he discussed such a projection with his accountant. As we discussed above, the facts reflect there was a reasonable expectation of profit, apart from tax benefits. The facts also demonstrate that petitioner's investigation of the investment was reasonable. Petitioner relied on the observations of a trusted business associate. Petitioner, a well-educated engineer and businessman, studied the relevant geological reports and discussed the investments with his business' C.P.A. and lawyer. Indeed, when petitioner felt that the Austin Mine was beginning to experience problems, petitioner made inquiries and attempted to become personally involved in order to rectify the problems. Finally, because of the series of unfortunate occurrences, we cannot say that petitioner's Austin Mine investment failed because it was a sham. Thus, we hold that this transaction is distinguishable from the one at issue in Rose v. Commissioner, supra. Accordingly, we hold that petitioner's Austin Mine investment *555 did not lack economic substance. The Summit Mine
Harrison, petitioner's expert witness, also submitted a profit projection for the Summit Mine. Harrison projected that the 1,500 tons of ore petitioner was entitled to mine would yield the following: 352 ounces of gold, 14,550 ounces of silver, 105,000 pounds of lead, and 117,250 pounds of zinc. Harrison further projected that petitioner would receive the following profit: Proceeds: 352 oz. gold at $ 400.00/oz.
$ 141,000.00   14,550 oz. silver at $ 5.40/oz.
78,570.00   105,000 lbs. lead at .20/lb.
21,000.00   117,250 lbs. zinc at .40/lb.
46,900.00   $ 287,470.00   X .80 recovery
rate
230,000.00   Less: Cost 1,500 tons at $ 75/ton
112,500.00   Investment
60,000.00   Net profit after investment
$  57,500.00   As with Harrison's projections for the Austin Mine, we note discrepancies in his projection for Summit, for which we shall also make adjustments. In his projection, Harrison did not explain the source of his figures for the amount of minerals that petitioner's *556 ore body would yield. Nor did Harrison testify where his figures came from. Although we accept his projections with respect to the silver, lead and zinc, we do not accept Harrison's gold projection. Harrison's expert report refers to assays done by others in 1943-1946 and 1964. Harrison cites the earlier assay on ore taken from a typical vein in Summit as yielding .0738 oz. gold per ton. The 1964 assay of ore taken from above petitioner's ore body yielded .085 oz. gold per ton. In 1985, Harrison's mining company, Harrison Mining, also assayed ore from Summit that graded out at .048 oz. gold per ton. Harrison Mining performed further milling in 1986, and the milled ore graded out at an average of .08 oz. gold per ton. We calculate the simple average of the four assay grades Harrison referenced in his report to be .0717 oz. gold per ton. Based on this average grade, we compute that petitioner's 1,500 tons of ore would yield 107.55 ounces of gold rather than the 352 ounces projected by Harrison. Using this recomputed gold figure and Harrison's figures for silver, lead, and zinc, we calculate that the 1,500 tons of ore petitioner was entitled to would yield the following loss: Proceeds:
107.55 ounces of gold at $ 400/oz.
$ 43,020.00    14,550 ounces of silver at $ 5.40/oz.
78,570.00    105,000 pounds of lead at .20/lb.
21,000.00    117,250 pounds of zinc at .40/lb.
46,900.00    189,490.00    X .80 recovery
rate
151,592.00    Less: Cost 1,500 tons at $ 75/ton
112,500.00    Investment
60,000.00    Loss
($ 20,908.00)   *557 Moreover, we note that Harrison's testimony regarding the general profitability of petitioner's Summit investment is inconsistent with the above analysis, and we therefore disregard such testimony. Accordingly, we hold that although the evidence shows that Summit was a working mine, petitioners have not proved that petitioner's investment had economic substance. Therefore, we hold for respondent on this issue. Section 616(a) Mining Development Expenditures
Having decided that petitioner's Austin investment was not a sham, we next address whether section 616(a) allows him a deduction in 1979 for mining development expenditures. Section 616(a) generally allows a deduction for expenditures paid or incurred during the taxable year for the development of a mine if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. Once a commercial ore body has been discovered, i.e., the development stage has been reached, development expenses consist of "that activity necessary to make a deposit accessible for mining." *558 Geoghegan & Mathis, Inc. v. Commissioner, 453 F.2d 1324 (6th Cir. 1972), affg. 55 T.C. 672 (1971). See also Estate of DeBie v. Commissioner, 56 T.C. 876, 892 (1971); S. Rept. No. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 542. Section 616 is not applicable, however, to development expenditures which are deductible under any other provision of the Code. Sec. 1.616-1(b)(1), Income Tax Regs. Nor does development expense include payment for a right of access to minerals. Geoghegan & Mathis, Inc. v. Commissioner, supra; Anderson v. Commissioner, 83 T.C. 898, 908 (1984), affd. without opinion 846 F.2d 76 (10th Cir. 1988), affd. sub nom. without opinion Clawson v. Commissioner, 846 F.2d 76 (10th Cir. 1988). The regulations also provide that a taxpayer need not pay the development costs directly and may instead engage a contractor to make the expenditures on the taxpayer's behalf. Sec. 1.616-1(a), Income Tax Regs. Furthermore, if a cash basis taxpayer pays an expense with funds borrowed from a third party, the expense is deductible when paid, not later *559 when the loan is repaid. Saviano v. Commissioner, 80 T.C. 955, 961 (1983), affd. 765 F.2d 643 (7th Cir. 1985); McAdams v. Commissioner, 198 F.2d 54 (5th Cir. 1952), affg. 15 T.C. 231 (1950); Crain v. Commissioner, 75 F.2d 962 (8th Cir. 1935); Granan v. Commissioner, 55 T.C. 753 (1971). A contingent future obligation of a cash basis taxpayer, however, is not deductible until the debt is actually paid. Saviano v. Commissioner, supra; Cavanaugh v. Commissioner, 2 B.T.A. 268, 272 (1925). Respondent first challenges whether the Austin Mine had reached the development stage at the time petitioner made his investment. Respondent also disputes whether commercially marketable quantities of silver existed. Moreover, respondent challenges whether the work performed on petitioner's ore body was for development expenses. Finally, respondent argues that petitioner should not be allowed any deduction for that part of the development expenditures related to the debt from petitioner to Equitable. We first turn to the issue of whether commercially marketable *560 quantities of silver were disclosed. The regulations provide that this determination is based upon all the facts and circumstances. Sec. 1.616-1(a), Income Tax Regs. Petitioners argue that the existence of commercially marketable quantities of silver ore at the Austin Mine had been disclosed at the time of petitioner's investment. Specifically, petitioners point to the various geological reports and assays that are in evidence. Petitioners' expert witness Harrison also testified that based on his examination of the Austin Mine in 1982 he felt that commercially marketable quantities of silver existed as of 1979, when petitioner invested. Respondent counters that the geological reports and Harrison's testimony concerning the disclosure of commercially marketable quantities of silver related to other parts of the Austin Mine, or the mine in general, and not specifically to petitioner's ore body. We do not, however, take as restrictive a view of this requirement as respondent. We find that although the geological reports and assays in evidence do not specifically address petitioner's ore body, they do fairly represent the mine as a whole, including petitioner's deposit. Moreover, *561 Harrison was familiar with the location of petitioner's ore body and resampled an area near petitioner's ore body. We find that based on Harrison's expertise and familiarity with the Austin Mine, his testimony does support the existence of commercially marketable quantities in petitioner's ore body. We also reject respondent's argument that the abandonment of the Hillside shaft and the later resumption of its mining, as well as other difficulties encountered, showed that the Austin Mine was not commercially feasible. We have already decided that at the time of petitioner's expenditure there existed a reasonable chance to realize a profit. We shall not reexamine that issue here. Upon reviewing all of the facts and circumstances, we hold that the existence of commercially marketable quantities of silver was disclosed before petitioner made his investment in the Austin Mine. We similarly dismiss respondent's assertion that petitioner has not proved that the Austin Mine had reached the development stage. Respondent bases this argument on the lack of evidence that a reasonable program for the exploitation of the deposit was established. We disagree. The facts reflect that a plan *562 did exist, notwithstanding that certain changes in the approach to mining the Austin Mine were made after petitioner's investment and that the project has thus far proved unsuccessful. We next address whether the $ 380,000 of expenditures claimed by petitioner qualify as development expenditures. Petitioners argue that the expenditures made on petitioner's behalf, as set forth in Argus' accounting to Equitable, reflected development work performed in accordance with petitioner's mining contract. Moreover, petitioners assert that these expenditures related to the opening up of the mine and shaft, as well as drilling performed to make petitioner's ore body accessible for the extraction of ore. Furthermore, Harrison testified that significant development work took place at the Austin Mine since 1979. Respondent challenges whether any expenditures were made for mine development. Specifically, respondent argues that the 20-percent sales commission always paid to Equitable could not be a development expense. According to the testimony of Equitable's president, Hughes, however, the sales commission was paid by the company owning the property and not the lessee of the property. Therefore, *563 respondent's assertion that petitioner attempted to deduct this commission as a development expenditure is unfounded. Respondent also suggests that part of petitioner's expenditures was used to pay Noack for building his mill and thus was not qualified as a development expenditure. There is no factual support whatsoever for this assertion, and we reject it. Therefore, we hold that the expenditures made on petitioner's behalf were for development. We now turn to respondent's argument that petitioner's $ 285,000 note to Equitable should not be recognized as a payment in 1979 because it was too contingent on a future event and thus unlikely to be paid. Respondent asserts that Equitable never actually paid Manhattan the $ 285,000 represented by petitioner's note. In his brief, respondent contends that "Equitable's cancelled note to the mining company was nothing more than an attempt to create an artificial tax benefit." Respondent also asserted in his opening remarks at trial that Equitable would write a check to the mining contractor, who would immediately turn around and write a check back to Equitable. Respondent, however, offered no evidence to support these assertions. Respondent *564 did argue that Manhattan's balance sheet as of December 31, 1980, which is in evidence, did not reflect Equitable's December 7, 1979, payment. This argument is without merit because the balance sheet was for a year after the questioned payment. In addition, although Manhattan's balance sheet did reflect unrecovered development costs of $ 836,800 as of December 31, 1980, there was no evidence presented at the trial that the amount representing petitioner's note was included in that figure. Moreover, the terms of the note from petitioner to Equitable did not provide that payments were contingent. We also note petitioner's testimony that he intended to pay the note and that no side agreement existed between Equitable and himself that would make the note contingent. Furthermore, the instant case is distinguishable from Saviano v. Commissioner, supra, which respondent cites in support of his position. In Saviano, the taxpayer borrowed from the promoter on a nonrecourse obligation payable from and secured only by the taxpayer's mineral claim. *565 80 T.C. at 955. In the instant case, the note was recourse on its face and there was no security agreement limiting payment to the proceeds of petitioner's mineral claim. Finally, petitioner mortgaged his residence to secure payment of the obligation when the obligation was extended. This action supports a finding that the debt was not contingent. At Risk Issue
We next address respondent's alternative argument that any loss to petitioner in 1979 from the Austin Mine activity should be limited to petitioner's cash investment of $ 95,000 because he was not at risk with respect to the $ 285,000 note to Equitable. Section 465(a)(1) generally limits losses from certain activities for any taxable year to the aggregate amount with respect to which the taxpayer is at risk. For years beginning in 1979, the section 465 at risk provisions generally apply to any activity engaged in by a taxpayer in carrying on a trade or business or for the production of income. Sec. 465(c)(3)(A). A taxpayer is generally at risk for an activity to the extent of the taxpayer's cash contribution and adjusted basis of other property contributed by the taxpayer to the activity. Sec. 465(b)(1)(A). *566 A taxpayer is also at risk for amounts borrowed for use in an activity to the extent that the taxpayer is personally liable for repayment or has pledged property, other than that used in the activity, as security for the borrowed amount. Sec. 465(b)(2). Section 465(b)(4) further provides, however, that notwithstanding any other provision in section 465, a taxpayer is not at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. The determination of whether a taxpayer is to be regarded as at risk on a debt obligation is to be made at the end of each taxable year. Sec. 465(a)(1); Krause v. Commissioner, 92 T.C. 1003, 1017 (1989); Levy v. Commissioner, 91 T.C. 838, 862 (1988). Petitioners contend that petitioner was and still remains personally liable for the outstanding balance of his note to Equitable. Petitioners also argue that the balance of the note to Equitable is secured by pledged property, the mortgage on petitioner's residence. Respondent first asserts that no obligation ever existed between petitioner and Equitable. [6] Respondent then alternatively *567 argues that even if an obligation did exist, it was nonrecourse, and accordingly, petitioner was not at risk with respect to it. At the outset we dismiss respondent's argument that no obligation ever existed between petitioner and Equitable. As we discussed in the preceding section, the evidence in this case simply does not support respondent's assertion in his brief that Equitable never loaned petitioner $ 285,000 and that Equitable's cancelled note to the mining company "was nothing more than paper that was intended to provide petitioner with a tax deduction and the promoter with a tax shelter sale." See also Rule 143(b). We decide this issue under section 465(b)(4), and therefore need not address the various other contentions made by the parties. Section 465(b)(4) provides that even though investors nominally may *568 be personally liable for debt obligations, for tax purposes they will not be considered at risk with respect to the debt if their ultimate liability is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Although neither the Code nor section 465(b)(4)'s legislative history defines "other similar arrangements," the legislative history does reflect concern with situations where investors are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. Krause v. Commissioner, supra; Levy v. Commissioner, supra at 864; Larsen v. Commissioner, 89 T.C. 1229, 1272-1273 (1987), on appeal (9th Cir., Dec. 12, 1988); Melvin v. Commissioner, supra at 70-71; Bennion v. Commissioner, 88 T.C. 684, 692 (1987); Porreca v. Commissioner, 86 T.C. 821, 838 (1986); S. Rept. No. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87. Respondent argues that even though petitioner was nominally personally liable on his obligation to Equitable, the obligation *569 was really nonrecourse, and that petitioner was also protected against any loss by agreement or guarantee. In support of his argument, respondent cites paragraph 13 of the mining contract between petitioner and Manhattan, which provides that: Miner [Manhattan] shall look solely to earnings derived from silver produced as given by Lessee [petitioner] to [Manhattan] in the Property and assets of [petitioner] for the payments and the performance of [petitioner]. In no event shall [petitioner] be personally liable for the payments or the performance of [Manhattan] other than from proceeds derived from the production and sale of silver and in the event of any default, no deficiency or other personal judgment will be requested or entered against [petitioner] with respect to the obligations contained herein. [Emphasis added.] Petitioners point out that the mining contract is between petitioner and Manhattan, which is not a party to the promissory note at issue. Therefore, they contend that any provision in this mining contract dealing with performance or nonperformance by a party to the contract is not relevant to whether petitioner was really at risk with respect *570 to the promissory note to Equitable, which was not a party to the contract. We agree with respondent that the overall effect of paragraph 13 of the mining contract between petitioner and Manhattan was to insulate petitioner from any realistic possibility of suffering an economic loss with respect to the amount represented by the promissory note. Although Equitable was not a party to the mining contract, as petitioners point out, the mining contract was the whole reason for the promissory note with Equitable ostensibly providing financing and acting as petitioner's agent. The second sentence of paragraph 13 protects petitioner from personal liability for the payment to Manhattan, which was the obligation underlying petitioner's note to Equitable. Therefore, notwithstanding the terms of the note, the mortgage on petitioner's home, petitioner's testimony, and Hughes' testimony, we read paragraph 13 of the mining contract, and in particular the second sentence therein, to insulate petitioner from being personally liable on the note, effectively making the obligation nonrecourse. Accordingly, we hold that petitioner was not at risk in 1979 for his $ 285,000 promissory note to Equitable *571 and that his loss for that year is limited under section 465(a)(1) to $ 95,000, the actual amount petitioner was at risk. Interest Expense
We next address whether petitioners are entitled to an interest deduction for 1982 for petitioner's $ 10,000 payment to Equitable by check dated December 29, 1982. In 1982, section 163(a) generally allowed a cash basis taxpayer a deduction for all interest paid within the taxable year on indebtedness. Furthermore, interest arising from sham transactions is deductible if the debt is genuine. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. Respondent initially argues that no payment of interest was made in 1982. Respondent then alternatively argues that even if payment was made, no genuine debt existed. Respondent further argues in the alternative that even if a debt existed, its payment was so highly contingent that it should not be recognized for tax purposes. We first address whether petitioner actually made a payment of interest in 1982. Petitioner's $ 10,000 cancelled check to Equitable dated December 29, 1982, was stipulated into evidence by the parties. In his opening argument at trial and in his *572 brief, respondent alleged that petitioner received a "check" from Equitable to cover his check to Equitable. Therefore, respondent contends, petitioner really did not make a cash payment. Other than this assertion by respondent, however, there is no evidence of such a scheme. Under respondent's cross-examination, petitioner did testify that he received a check after the first of the year that enabled him to pay the check to Equitable. Respondent did not question petitioner any further on this matter and there is no evidence in this record that the check was from Equitable or was part of some scheme as alleged by respondent. Petitioner's testimony merely shows that he may not have had sufficient funds at the time he wrote the check. At this point we note the general rule that payment by check constitutes payment for cash basis taxpayers at the time issued to the payee as long as the check is honored. Estate of Spiegel, 12 T.C. 524, 529 (1949). Our examination of the front and back of the cancelled check indicates that the check was honored in early January 1983. Therefore, we hold that petitioner made the payment on December 29, 1982, the date he issued the *573 check. In his alternative arguments, respondent again turns to his previous arguments that petitioner's debt was not genuine, or even if genuine, was too contingent to support petitioners' claimed interest deduction. As we discussed, supra, petitioner's debt to Equitable was genuine, and although we found that the debt was ultimately in the nature of nonrecourse financing, it was valid and not so highly contingent as to be disregarded for interest deduction purposes. See Rose v. Commissioner, 88 T.C. at 386; see also Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. Furthermore, the cases cited by respondent involved sham transactions where there was no genuine debt and are therefore distinguishable from the instant case. Accordingly, we hold that petitioners are allowed their claimed $ 10,000 interest deduction for 1982. Miscellaneous Business Expenses
We now address the final issue of whether petitioners are allowed deductions for the following expenses claimed by them in 1982 for their mining business: Dues and Publications
$    90
Office Supplies and Postage
20
Utilities and Telephone
53
Legal and Travel Expense
1,603
*574 Section 162(a) generally allows a deduction for ordinary and necessary business expenses paid in carrying on a trade or business. Deductions for travel expense are further conditioned upon satisfying the substantiation requirements of section 274(d), which requires, inter alia, that a taxpayer substantiate "by adequate records or by sufficient evidence corroborating the taxpayer's own statement": (A) the amount of expense, (B) the time and place of the travel, and (C) the business purpose of the expense. The regulations define "adequate records" as a diary, account book, or similar record sufficient to establish each of the above elements. Sec. 1.274-5(c)(2)(i), Income Tax Regs. Furthermore, the "record must be prepared or maintained in such manner that each recording of an element of an expenditure is made at or near the time of the expenditure." Sec. 1.274-5(c)(2)(ii), Income Tax Regs.
Respondent's determinations are presumed correct, and accordingly, petitioners bear the burden of proof. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). Furthermore, deductions are a matter of legislative grace and each statutory requirement must be *575 satisfied before the deduction can be allowed. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The evidence presented by petitioners on these claimed deductions consisted solely of petitioner's general testimony regarding the trips he took to visit his mines. No evidence was presented concerning any of the other claimed expenses. At trial, the parties stipulated as to the amount paid for travel expenses. [7] Petitioners, however, failed to show what portion of the claimed $ 1,603 expense for legal and travel expenses related to travel. Moreover, petitioners failed to introduce any evidence to satisfy the substantiation requirements of section 274(d). Accordingly, we hold that petitioners have failed to carry their burden of proof on this issue, and we hold for respondent. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All references to petitioner hereafter shall be to Jonas R. Bryant, and all references to petitioners shall be to both Jonas R. and Carmen L. Bryant. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Although there appears to be a discrepancy because American International signed the mining contract and Keystone performed the work, we find it insignificant because James Fraley appears to be the principal in both corporations.↩
4. A troy ounce is slightly larger than an avoirdupois ounce -- 1 oz. troy = 31.103 grams; 1 oz. avoirdupois = 28.35 grams. Dictionary of Mining, Mineral, and Related Terms 1169 (1968). Harrison's figures do not specify which unit of measurement he is using. For our purposes, however, we find any difference to be insignificant. ↩
5. Statistical Abstract of the United States 1989, 476 table no. 767 (109th ed.)↩
6. In his opening statement at trial, respondent also alleged that pursuant to section 465(b)(3)(A)↩ petitioner was not at risk with respect to the borrowed amount because Equitable had an interest in the Austin mining activity other than as a creditor. Respondent has not, however, addressed this argument in his brief, and accordingly, we deem it abandoned.
7. Petitioners argue that respondent stipulated that the section 274(d) substantiation requirements were met as well. We do not, however, view the parties' oral stipulation as including this concession by respondent.↩